IN RE INTEREST OF MAXWELL T.,
A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. LLOYD T.,
ALSO KNOWN AS B.J. T., APPELLANT.
721 N.W.2d 676

Filed September 19, 2006.   No. A-05-1477.

Allan A. Armbruster, Jr., for appellant.

Stuart J. Dornan, Douglas County Attorney, and Chad M. Brown for appellee.

IRWIN, MOORE, and CASSEL, Judges.

MOORE, Judge.

## I. INTRODUCTION

Lloyd T., also known as B.J. T., appeals an order by the separate juvenile court of Douglas County, in which order the court found that it had continuing jurisdiction in the matter and adjudicated Lloyd's son, Maxwell T., as a juvenile under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2004). For the reasons set forth herein, we affirm in part, and in part remand with directions.

## II. BACKGROUND

Maxwell was born to Lloyd and Marsha L. on February 3, 2003, in Omaha, Nebraska. Lloyd and Marsha were divorced pursuant to a decree of dissolution entered in Minnehaha County, South Dakota, on July 19, 2004. Marsha was provided notice of the dissolution proceedings, but did not appear personally or by counsel. The decree granted custody of Maxwell to Lloyd, with supervised visitation rights for Marsha. The decree further provided that Marsha could not remove Maxwell from Minnehaha or Lincoln Counties, South Dakota, without the prior written consent of Lloyd or an order of the court.

At some point, Lloyd apparently committed a parole violation and was returned to the South Dakota State Penitentiary. Lloyd was on parole from two convictions he received in 1997, for grand theft by obtaining property or services with a false credit card and being a habitual offender. In late August 2004, Marsha took physical custody of Maxwell and brought him to Bellevue, Nebraska, where Marsha and Maxwell lived with Marsha's aunt.

On January 20, 2005, Marsha was transported by ambulance to a hospital after ingesting a large quantity of vodka. Marsha reported that she regularly consumed as much as 1½ liters of

vodka per day and that she decided to enter an alcohol treatment program. Marsha stated that there was no one who could care for Maxwell. A police officer was called to the hospital and placed Maxwell in an emergency foster home.

The State filed a petition on January 21, 2005, which alleged that Maxwell was within the meaning of § 43-247(3)(a) in that Maxwell was "homeless or destitute, or without proper support through no fault" of Marsha. The petition alleged that Marsha had been hospitalized on or about January 20 for psychiatric treatment and that she had reported that there was no one to care for Maxwell; the petition asserted that this placed Maxwell at risk for harm. A motion for temporary custody was also filed that day, which motion requested that custody of Maxwell be placed with the Department of Health and Human Services (DHHS). The juvenile court granted the motion for temporary custody that same day, placing custody of Maxwell with DHHS.

A detention hearing was held on February 2, 2005. Marsha appeared and was represented by her attorney and a guardian ad litem. Marsha reported that she was no longer hospitalized, but had entered an alcohol treatment program in Omaha. Marsha was advised of her rights in the proceedings and did not contest the continued detention of Maxwell with DHHS. The court order resulting from this hearing reflects that the court found that jurisdiction was proper and continued custody of Maxwell with DHHS, with reasonable rights of supervised visitation granted to "the parents." There was no mention of Lloyd at this hearing, but the court order reflects that Marsha was ordered to complete an affidavit of identification of Maxwell's father.

An adjudication hearing with respect to Marsha was held on May 4, 2005. Marsha admitted to the allegations in the petition, with the language of the petition changed from Marsha's being hospitalized "for psychiatric treatment" to her being hospitalized "for alcoholism & depression." The court order resulting from this hearing indicates that the court found that jurisdiction was proper, and Maxwell was adjudicated under § 43-247(3)(a). Custody of Maxwell was continued with DHHS. No mention of Lloyd was made at the hearing, but the court order reflects that Marsha was again ordered to complete an affidavit of identification of Maxwell's father.

A disposition and permanency planning hearing was held on June 27, 2005. A court report and case plan prepared by Monica Lewis, the DHHS caseworker for the case, was admitted into evidence. The court report, dated June 23, 2005, listed Lloyd as Maxwell's father and provided an Omaha address for Lloyd. The report, together with other evidence, indicated that Marsha was enrolled in a halfway house chemical dependency treatment program and was making good progress. The case plan listed the permanency objective as reunification, with a target date of October 1, 2005.

Also admitted into evidence was a report by Marsha's guardian ad litem. The report indicated that Marsha desired to be reunited with Maxwell and to have "full care, custody, and control" of him. The report also stated the following:

> Finally, Marsha expressed concerns regarding custody of [Maxwell] upon termination of the Juvenile case. Prior to this Court acquiring Jurisdiction, custody of the child was granted by the state of South Dakota to the child's father, Lloyd . . . pursuant to a divorce decree entered on July 19th, 2004. [Lloyd] is currently incarcerated, and Marsha pressed the County Attorney to bring [Lloyd] under this Court's jurisdiction in order not [to] leave a jurisdictional vacuum upon disposition.

One of the recommendations in the guardian ad litem's report was that Lloyd's "incarceration and his status as the default custodian upon termination of jurisdiction be taken into account at the disposition stage of the proceedings."

The guardian ad litem voiced these concerns at the June 27, 2005, hearing, stating to the court:

> [M]y only concern in terms of a review timeline is that custody of [Maxwell] actually belongs to [Lloyd] under the full decree from another state, and that's something that [Marsha] needs to work on. Arturo Perez, the previous county attorney on this case, had expressed his intention to file against [Lloyd], and we kind of don't know where things are at right now, so that's something to keep in mind as we are setting reviews.

The State responded that it understood Lloyd was incarcerated in South Dakota and that the State would look further into the

matter. The court later stated, "I appreciate the State looking into that other matter because I think as we — as you [Marsha] progress, we want to be able to move in that direction, too." In the court order resulting from this hearing, the court found that jurisdiction was proper, continued custody of Maxwell with DHHS, and granted Marsha reasonable rights of semisupervised visitation transitioning into overnights and weekends. The court found that the permanency objective was reunification. There was no reference to Lloyd in the court order.

On June 29, 2005, the State filed a supplemental petition which alleged that Maxwell was within the meaning of § 43-247(3)(a) with respect to Lloyd. Specifically, the supplemental petition alleged that Maxwell was "lacking proper parental care by reason of the faults or habits of" Lloyd, in that Lloyd was currently incarcerated and unable to care for Maxwell, had had no contact with Maxwell for more than 6 months, and had failed to provide proper parental care for Maxwell and in that because of those allegations, Maxwell was at risk for harm. The supplemental petition listed Lloyd's address as the South Dakota State Penitentiary, in Sioux Falls, South Dakota.

A first appearance hearing on the supplemental petition was held on July 14, 2005. The proceedings are not included in the bill of exceptions, but the court order reflecting this hearing indicates that the State, Marsha's guardian ad litem, Maxwell's guardian ad litem, and Marsha were present. The adjudication hearing on the supplemental petition was set for September 22. The court order states that "[n]otice by publication may be considered if a diligent search fails to indicate [the] location of Lloyd . . . ."

An order filed August 18, 2005, indicates that the court appointed counsel for Lloyd and noted that Lloyd's address was the South Dakota State Penitentiary.

On September 14, 2005, the State filed a motion to continue the adjudication on the supplemental petition because, "[t]hrough inadvertence of the County Attorney's Office," Lloyd was served with a summons which indicated an incorrect hearing date. The motion stated that Lloyd's attorney did not object to the motion. In an order filed September 15, the motion was sustained and the adjudication was continued to October 25.

On September 19, 2005, a review and permanency planning hearing was held with respect to Marsha. Lloyd and his attorney did not appear. The State offered into evidence, among other things, a two-page letter from Lloyd to Lewis, the DHHS caseworker. The court did not receive the letter into evidence, stating that it would be inappropriate since the adjudication for Lloyd was pending and Lloyd's attorney was not present. Marsha's attorney reported that Marsha was doing "wonderfully well" and was ready to move into an outpatient program where Maxwell could reside with her. Marsha's attorney then stated, "I hate to open a can of worms, but [Lloyd], who is the father [and] has a case pending, is currently the custodial parent. I think probably we're looking at filing a custody action sometime in the near future." After this comment, the matter was not further discussed.

Several exhibits were admitted into evidence at the hearing, including a court report prepared by Lewis, dated September 14, 2005, which discussed Lloyd in some detail. The report stated that Lloyd was incarcerated and was anticipated to be released in 2009, that Lloyd wrote to Lewis regarding Maxwell, and that Lewis responded to the letter. The report indicated that Lloyd stated he had custody of Maxwell prior to his incarceration, at which time he released the child to Marsha, and that Lloyd stated he would like to see Maxwell return to Marsha's care if Marsha was sober and able to care for him.

A report by the foster care review board was also admitted into evidence. The report stated that Lloyd and Marsha both claimed Lloyd had custody of Maxwell and that Lloyd indicated he allowed Marsha to have custody of Maxwell when Lloyd returned to incarceration for a parole violation, but that Lloyd indicated Marsha "was not to" remove Maxwell from South Dakota. The report also stated that Marsha said that Lloyd wrote a letter giving Marsha custody of Maxwell.

The court order resulting from the September 19, 2005, review and permanency planning hearing indicates that the court found that jurisdiction was proper. Custody of Maxwell was continued with DHHS, but the court stated that Maxwell could be placed with Marsha once she established housing. The court found the permanency objective to be reunification.

On September 19, 2005, the State filed a praecipe, requesting that summons be issued to Lloyd for the October 25 hearing, and Lloyd was personally served with the summons on September 23. The summons requested that Lloyd personally appear at the hearing.

On October 14, 2005, Lloyd filed the following documents with the juvenile court: a motion to dismiss, a motion for pretrial hearing, a motion for telephonic hearing, a request for production of documents, and a "Notice of Intention to Serve Rule [34A] Records Subpoena" with an attached subpoena duces tecum for Marsha's aunt.

The motion to dismiss sought to dismiss the supplemental petition upon the following grounds: (1) lack of subject matter jurisdiction under Nebraska's Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), (2) that Maxwell had not been abandoned or subjected to or threatened with mistreatment or abuse within the meaning of the UCCJEA, (3) that an adjudication hearing had not been held within 90 days after the supplemental petition was filed, and (4) that the supplemental petition was so vague and ambiguous that Lloyd was not on notice of the prohibited conduct alleged to have put Maxwell at risk for harm. The motion for pretrial hearing requested a hearing so that the court "hears and enters its orders on pre-trial motions, sets a date for the completion of discovery prior to trial and schedules a date for an adjudication hearing in this cause." The motion for telephonic hearing requested that Lloyd appear by telephone at the adjudication hearing. Lloyd's request for the production of documents requested that Marsha produce, pursuant to Neb. Ct. R. of Discovery 34 (rev. 2000), documents and items related to various communications between and among Lloyd, Marsha, and Maxwell, related to the time period of September 21 to October 13, 2004. The "Notice of Intention to Serve Rule [34A] Records Subpoena" stated that Lloyd would be issuing and serving a subpoena on Marsha's aunt. The attached subpoena duces tecum requested that Marsha's aunt produce, pursuant to Neb. Ct. R. of Discovery 34A (rev. 2004), documents similar to those requested of Marsha.

The adjudication hearing on the supplemental petition was held on October 25, 2005. Present at the hearing were counsel

for the State, counsel for Lloyd, guardian ad litem for Maxwell, counsel for Marsha, guardian ad litem for Marsha, and Marsha. At the start of the hearing, the court addressed Lloyd's motions. The motion to dismiss was discussed, and a transcript of the June 27 proceedings was admitted into evidence for the purpose of demonstrating that the court was placed on notice at that hearing that Lloyd had custody of Maxwell pursuant to the South Dakota divorce decree. Lloyd's counsel stated that under the UCCJEA, the juvenile court should have contacted the South Dakota court to resolve the jurisdictional issue. The court denied the motion to dismiss and stated, "[T]he jurisdiction of this Court, for the safety and the protection of a child either living or to be found in Douglas County, Nebraska, State of Nebraska, temporarily and during the pendency of any proceeding in this Court, trumps, if you will, any custody order from any other Court." The court further stated:

> So the Uniform Child Custody Act that you quote does not apply to this case, and when and if this Court terminates its jurisdiction, presumably the case goes back to the status quo before it was filed, unless another court changes its custody order. So I am not interfering with that except as is provided by the laws of this State.

The motion for pretrial hearing, request for production of documents, and notice of intention to serve a subpoena were next addressed. The court denied these motions, stating, "[W]e had a first appearance, I notified [Lloyd], I appointed [counsel for Lloyd], all in sufficient time to have conducted discovery . . . ." The court stated that the motions were denied because the matter was set for adjudication and there had not been a request for a continuance of the hearing. The court then addressed the motion for telephonic hearing and asked Lloyd's counsel if Lloyd was available that day, to which counsel responded that he did not know. The motion was denied, and the court proceeded with the adjudication.

Lewis, the DHHS worker for the case, testified that at the time the case began, Marsha was caring for Maxwell and had resided in Nebraska for at least 5 months. Lewis then testified regarding Lloyd and her communications with Lloyd. Lewis stated that Lloyd had communicated with Lewis by mail and

that in one of Lloyd's letters, Lloyd stated that he had given Maxwell to Marsha to care for while Lloyd was incarcerated. Lewis testified that Lloyd had not had any contact with Maxwell for the 10 months that she had been the caseworker. Lewis stated that a clerk at the penitentiary told her that Lloyd would be incarcerated until 2009. Lewis stated that because Lloyd was incarcerated, he had not been able to provide for proper care and parental support of Maxwell. Lewis stated that in her opinion, Maxwell was at risk for harm because Lloyd left Maxwell in Marsha's care, at a time when Marsha was unable to care for him, and because Lloyd was unable to care for Maxwell while in the penitentiary.

Upon cross-examination, Lewis stated that one of Lloyd's letters was dated May 25, 2005, and that she responded to that letter in a letter written June 13. Both letters were received into evidence. In summary, Lloyd's letter asked Lewis to provide him with information regarding Maxwell and whether Maxwell was in her care. The letter also listed the various ways that Lloyd had attempted to contact Lewis for information on Maxwell. Lewis' response letter informed Lloyd that Maxwell was in DHHS' care due to Marsha's needing assistance and stated that Maxwell was doing well. Lewis' letter also stated Marsha had indicated that she would be in danger if Lloyd knew her whereabouts and that Lloyd was violating a court order by trying to locate her. Lewis provided contact information for the judge on the case to Lloyd and advised Lloyd that he could intervene if he chose to do so. Lewis testified that she had received one other correspondence from Lloyd within the last 90 days. Lewis was asked if it was her opinion that Lloyd was "uncaring" about Maxwell's care, to which she responded, "No. Any father who — Any father that contacts [DHHS] and questions about in regards to the whereabouts of [his] child has to be caring." Lewis was also asked if she was aware of Marsha's condition at the time Lloyd gave Maxwell to her, to which Lewis responded she did not know.

Lloyd called Marsha to testify. Marsha stated that she received a videotape from Lloyd in October 2004 and that the videotape depicted Lloyd reading two books to Maxwell. Marsha stated that she had received no additional correspondence from Lloyd

and that to her knowledge, her aunt had not received any correspondence from Lloyd to Maxwell. Marsha stated that Lloyd gave her written consent to remove Maxwell from South Dakota.

A report entitled "Initial Assessment Worksheet For Abuse/Neglect" was admitted into evidence, offered by Lloyd's counsel. The report is dated January 25, 2005, and was completed by a DHHS worker other than Lewis. The report indicated that Lloyd had "full custody" of Maxwell and that Lloyd was incarcerated in South Dakota. The report also stated that the worker did not notify Lloyd that Maxwell was in foster care because Lloyd was incarcerated in South Dakota.

The court order reflecting this hearing, filed November 3, 2005, indicates that the court denied the motion to dismiss and the motion for telephonic hearing. The court again found that jurisdiction was proper, Maxwell was adjudicated under § 43-247(3)(a) with respect to Lloyd, and custody of Maxwell was continued with DHHS. It is from this court order that Lloyd appeals.

### III. ASSIGNMENTS OF ERROR

Lloyd asserts eight assignments of error, which can be rephrased and consolidated into the following: (1) The juvenile court erred in finding that it had continuing subject matter jurisdiction in this case, and (2) even if the court did have jurisdiction, it committed several errors in the adjudication of the supplemental petition, including (a) denying Lloyd's motion to dismiss based upon an alleged violation of Lloyd's right to a speedy adjudication, (b) failing to advise Lloyd of his rights pursuant to Neb. Rev. Stat. § 43-279.01 (Reissue 2004), (c) denying Lloyd's motion for pretrial hearing, (d) denying Lloyd the use of compulsory discovery proceedings, and (e) finding that Maxwell was within § 43-247(3)(a) with respect to Lloyd.

### IV. STANDARD OF REVIEW

When a jurisdictional question does not involve a factual dispute, determination of the issue is a matter of law, which requires an appellate court to reach a conclusion independent from that of the trial court. However, when the determination rests on factual findings, a trial court's decision on the issue will be upheld unless the factual findings concerning jurisdiction

are clearly incorrect. *White v. White*, 271 Neb. 43, 709 N.W.2d 325 (2006).

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006).

## V. ANALYSIS

### 1. JURISDICTION UNDER UCCJEA

#### (a) Application of UCCJEA

Lloyd asserts that the juvenile court erred in finding that the UCCJEA did not apply to the matter. We initially note that the applicable statutory scheme is the UCCJEA, Neb. Rev. Stat. §§ 43-1226 through 43-1266 (Reissue 2004), rather than the Nebraska Child Custody Jurisdiction Act (NCCJA), because the first petition in this child custody proceeding was made in January 2005, well after the date the UCCJEA became operative, January 1, 2004. See § 43-1226 (Supp. 2003).

At the adjudication hearing on the supplemental petition, the judge did verbally state that the UCCJEA did not apply to the case; however, this comment was preceded by language which seemed to indicate that the court was exercising temporary emergency jurisdiction under the UCCJEA, which jurisdiction we discuss below. Whatever the effect of the juvenile court's verbal statement, we find that a case brought under § 43-247(3)(a) fits the definition of a "[c]hild custody proceeding" under the UCCJEA, see § 43-1227(4), and that therefore, the UCCJEA is applicable. Section 43-1227(4) of the UCCJEA provides that the term "[c]hild custody proceeding" shall mean "a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue" and that the term "includes a proceeding for divorce, separation, neglect, abuse, [or] dependency . . . in which the issue may appear." The supplemental petition was filed under the dependency statute, § 43-247(3)(a), and essentially alleged neglect of Maxwell by Lloyd, and the decisions made by the juvenile court in the course of these proceedings

affected Maxwell's legal and physical custody. Pursuant to § 43-1227(4), the juvenile court was involved in a child custody proceeding, and the UCCJEA was applicable.

(b) Subject Matter Jurisdiction

Lloyd next asserts that the juvenile court, upon being informed that a South Dakota court had made a prior child custody determination, erred in its refusal to contact and communicate with the South Dakota court and in finding that it had subject matter jurisdiction in the matter for purposes other than temporary emergency jurisdiction. Lloyd appears to admit that the juvenile court's initial exercise of jurisdiction over Maxwell was proper, under the temporary emergency jurisdiction granted under § 43-1241 of the UCCJEA, but asserts that once the juvenile court was aware that custody of Maxwell was granted to Lloyd in a South Dakota divorce decree, the court erred in continuing to exercise jurisdiction.

The pertinent portions of the UCCJEA concerning temporary emergency jurisdiction, codified in § 43-1241, provide:

(a) A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.

. . . .

(c) If there is a previous child custody determination that is entitled to be enforced under the [UCCJEA], or a child custody proceeding has been commenced in a court of a state having jurisdiction under sections 43-1238 to 43-1240, any order issued by a court of this state under this section shall specify in the order a period that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction under such sections. The order issued in this state remains in effect until an order is obtained from the other state within the period specified or the period expires.

(d) A court of this state which has been asked to make a child custody determination under this section, upon being informed that a child custody proceeding has been

commenced in, or a child custody determination has been made by, a court of a state having jurisdiction under sections 43-1238 to 43-1240, shall immediately communicate with the other court. A court of this state which is exercising jurisdiction pursuant to such sections, upon being informed that a child custody proceeding has been commenced in, or a child custody determination has been made by, a court of another state under a statute similar to this section shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order.

In the case before us, the juvenile court, unaware of the South Dakota divorce decree, initially assumed original jurisdiction under Neb. Rev. Stat. § 43-248 (Reissue 2004) when it granted the January 21, 2005, order for temporary custody. The court later adjudicated Maxwell under § 43-247(3)(a), with respect to Marsha, on May 4. It was not until June 27 that the court was informed of the prior out-of-state custody determination. Maxwell was subsequently adjudicated with respect to Lloyd on November 3.

This case is factually similar to *In re Interest of L.W.*, 241 Neb. 84, 486 N.W.2d 486 (1992). Although *In re Interest of L.W.* was decided under the former NCCJA, not the UCCJEA, we find its reasoning to be instructive to the present case. In *In re Interest of L.W.*, the juvenile court, unaware of the existence of a prior Iowa divorce decree granting custody of the child to the mother, initially assumed jurisdiction over the child under § 43-247(3)(a). It was not until nearly 2 years after the initial adjudication of the child that the court was informed of the prior out-of-state custody determination. The Nebraska Supreme Court found that under the NCCJA provision concerning emergency jurisdiction (which is substantially similar to the UCCJEA provision cited above), the juvenile court had temporary emergency jurisdiction to make a temporary custody placement of the child. The court reasoned that it was appropriate for the juvenile court to assume jurisdiction, since the child was physically present in Nebraska and an emergency existed as a result of sexual abuse by the child's stepfather. The court found

that the emergency situation was ongoing; however, it noted that the emergency provision is limited in duration and does not confer jurisdiction to make permanent custody determinations or modify the custody decree. The court determined that pursuant to the NCCJA, the Iowa court retained continuing jurisdiction over the custody determination, and upon remand, it ordered the juvenile court to refrain from modifying the Iowa divorce decree and to communicate with the Iowa court to determine the appropriate forum for the case. See, also, *In re Interest of J.L.H., J.L.H., and R.H.,* 2 Neb. App. 40, 507 N.W.2d 641 (1993) (adjudication affirmed, with (1) instruction to juvenile court to communicate with Missouri court which rendered custody decree to determine more appropriate forum before further adjudicating custody of children and (2) jurisdictional limitation against rendering permanent custody order unless Missouri court affirmatively declines jurisdiction or fails to take appropriate action).

Lloyd argues that at the time the juvenile court was put on notice of the existing South Dakota custody determination, the juvenile court's temporary emergency jurisdiction under § 43-1241 terminated, because an "emergency" no longer existed. Although we agree that emergency jurisdiction is temporary in nature, see *In re Interest of L.W., supra,* we disagree that emergency jurisdiction ceases to exist simply upon notification of another court's custody determination. Notwithstanding the fact that the November 3, 2005, order is a final order adjudicating Maxwell to be a child within the meaning of § 43-247(3)(a), the order does not make a permanent custody disposition of Maxwell. The court's November 3 order merely continues the temporary custody of Maxwell with DHHS. Therefore, so long as an emergency with regard to Maxwell continued to exist, the court retained emergency jurisdiction powers. See *In re Interest of L.W., supra.* Thus, the November 3 adjudication order did not violate the proposition that emergency jurisdiction is temporary in nature, and the question we must now address is whether an emergency situation with Maxwell did in fact continue after the juvenile court became aware of the South Dakota order, so as to support the court's continuing jurisdiction over Maxwell. Clearly, the facts in this case do support such continuing jurisdiction. At the time of the adjudication of the supplemental

petition, Maxwell was in Nebraska, neither Marsha nor Lloyd could assume custody of Maxwell, and there was no evidence that any other person, such as a relative, could do so. Maxwell had no one to care for him, and we find that the emergency situation was ongoing. Therefore, the juvenile court properly exercised jurisdiction under § 43-1241 at the time of the filing and adjudication of the supplemental petition. This holding is subject to the jurisdictional limitation set forth below.

Because the South Dakota court has entered a child custody decree and Lloyd still lives in South Dakota, the South Dakota court retains continuing jurisdiction to make any permanent changes in custody. The juvenile court must immediately communicate with the South Dakota court as required by § 43-1241(d). Further, the juvenile court is without jurisdiction to render a permanent custody order unless the South Dakota court affirmatively declines jurisdiction or fails to take appropriate action.

### (c) Parties' Failure to Inform Juvenile Court of Prior Child Custody Determination

Finally, Lloyd appears to argue that the juvenile court was deprived of jurisdiction because of the parties' failure to inform the court of the prior child custody determination. However, this argument is not assigned as error in Lloyd's brief. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *White v. White*, 271 Neb. 43, 709 N.W.2d 325 (2006).

### 2. Adjudication of Maxwell

Lloyd alleges that the juvenile court made several errors regarding Maxwell's adjudication. Specifically, Lloyd alleges that the court erred in (1) denying Lloyd's motion to dismiss based upon an alleged violation of Lloyd's right to a speedy adjudication, (2) failing to advise Lloyd of his rights pursuant to § 43-279.01, (3) denying Lloyd's motion for pretrial hearing, (4) denying Lloyd the use of compulsory discovery proceedings, and (5) finding that Maxwell was within § 43-247(3)(a) with respect to Lloyd.

### (a) Speedy Adjudication

Lloyd asserts that the juvenile court erred when it denied Lloyd's motion to dismiss based upon an alleged violation of Lloyd's right to a speedy adjudication. Lloyd claims that pursuant to Neb. Rev. Stat. § 43-278 (Reissue 2004), an adjudication must occur within 90 days of the filing of a petition or the State is required to make a showing of good cause, on the record, for why the petition should not be dismissed. Lloyd claims that because the adjudication on the supplemental petition was not held within 90 days of the filing of the supplemental petition and the State did not make a showing of good cause on the record as to why the supplemental petition should not have been dismissed, the court erred in denying Lloyd's motion to dismiss. Section 43-278 provides as follows, in relevant portion:

Except as provided in sections 43-254.01 and 43-277.01, all cases filed under subdivision (3) of section 43-247 shall have an adjudication hearing not more than ninety days after a petition is filed. Upon a showing of good cause, the court may continue the case beyond the ninety-day period.

In the present case, the supplemental petition was filed on June 29, 2005, and the adjudication hearing was set for September 22. On September 14, the State filed a motion to continue the adjudication on the supplemental petition because, "[t]hrough inadvertence of the County Attorney's Office," Lloyd was served with a summons which indicated an incorrect hearing date. The motion stated that Lloyd's attorney did not object to the motion. The motion was sustained, and the adjudication was continued to October 25. On September 23, Lloyd was served with summons and notice of the October hearing date. The adjudication was held on October 25, more than 90 days after the filing of the supplemental petition.

While § 43-278 provides that an adjudication hearing shall be conducted within 90 days after a petition is filed, this court has held that § 43-278 is directory, not mandatory. *In re Interest of Brianna B. & Shelby B.*, 9 Neb. App. 529, 614 N.W.2d 790 (2000). As such, the provision does not mandate that a case be dismissed if the adjudication is not completed within 90 days. The facts of the present case indicate that the adjudication was completed approximately 4 months after the supplemental petition

was filed. We note that the passage of some of this time occurred due to a continuance which arose from attempting to properly serve Lloyd and that Lloyd's counsel did not object to the motion for continuance. We do not find an abuse of discretion by the trial court in denying Lloyd's motion to dismiss.

(b) Failure to Advise of Rights Pursuant to § 43-279.01

Lloyd claims that the court erred in failing to advise Lloyd of his rights pursuant to § 43-279.01, including the right to confront and cross-examine witnesses and to compel witnesses to attend and testify. Section 43-279.01 provides, in relevant part, as follows:

(1) When the petition alleges the juvenile to be within the provisions of subdivision (3)(a) of section 43-247 or when termination of parental rights is sought pursuant to subdivision (6) or (7) of section 43-247 and the parent or custodian appears with or without counsel, the court shall inform the parties of the:

(a) Nature of the proceedings and the possible consequences or dispositions pursuant to sections 43-284, 43-285, and 43-288 to 43-295;

(b) Right to engage counsel of their choice at their own expense or to have counsel appointed if unable to afford to hire a lawyer;

(c) Right to remain silent as to any matter of inquiry if the testimony sought to be elicited might tend to prove the parent or custodian guilty of any crime;

(d) Right to confront and cross-examine witnesses;

(e) Right to testify and to compel other witnesses to attend and testify;

(f) Right to a speedy adjudication hearing; and

(g) Right to appeal and have a transcript or record of the proceedings for such purpose.

(2) After giving the parties the information prescribed in subsection (1) of this section, the court may accept an in-court admission, an answer of no contest, or a denial from any parent or custodian as to all or any part of the allegations in the petition. The court shall ascertain a factual basis for an admission or an answer of no contest.

This court has found that when a parent appears, with or without counsel, for an adjudication hearing and the parent is not informed of his or her rights pursuant to § 43-279.01, the resulting adjudication order must be reversed. See *In re Interest of Billie B.*, 8 Neb. App. 791, 601 N.W.2d 799 (1999). The instant case is distinguishable, however, because Lloyd was not present at the adjudication hearing. The question then becomes whether § 43-279.01 is applicable when a parent is not present at the relevant hearing. The parties cited no case law which addresses this issue, and we have found none.

Statutory interpretation presents a question of law. *McCray v. Nebraska State Patrol*, 271 Neb. 1, 710 N.W.2d 300 (2006). Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *State v. Wester*, 269 Neb. 295, 691 N.W.2d 536 (2005). Section 43-279.01(1) provides that a juvenile court must inform a parent of the rights listed in the statute when the parent "appears with or without counsel." Our plain reading of the statute indicates that the language "with or without counsel" indicates that the parent must actually be present in court for the statute to apply and that appearance by counsel alone does not trigger the statute. Lloyd was not present in court at the adjudication hearing. Therefore, § 43-279.01 is not applicable to the present situation and the juvenile court did not err in adjudicating Maxwell under the supplemental petition before Lloyd was provided a rights advisory pursuant to § 43-279.01. We note that Lloyd has not assigned as error a denial of due process by the failure to be informed of these rights, compare *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004); nor has Lloyd assigned as error the denial of his motion to appear by telephone. Further, Lloyd's counsel did not move for a continuance at the adjudication hearing in order to secure Lloyd's presence. For all of these reasons, this assignment of error has no merit.

#### (c) Motion for Pretrial Hearing

Lloyd asserts that the court erred in denying his motion for pretrial hearing. The motion for pretrial hearing requested a

hearing so that the court "hears and enters its orders on pre-trial motions, sets a date for the completion of discovery prior to trial and schedules a date for an adjudication hearing in this cause." The court denied this motion at the beginning of the adjudication hearing, stating that Lloyd's counsel had sufficient time to conduct discovery and that Lloyd had not requested a continuance of the hearing. We find no error in the court's denial of the motion for pretrial hearing, particularly in light of Lloyd's assertions concerning a speedy adjudication.

(d) Compulsory Discovery Proceedings

Lloyd claims that the court erred in denying Lloyd the use of compulsory discovery proceedings. Lloyd's motion for the production of documents requested that Marsha produce, pursuant to discovery rule 34, any materials related to communications between Lloyd, Maxwell, and Marsha. Lloyd also filed a "Notice of Intention to Serve Rule [34A] Records Subpoena," which notice stated that Lloyd would be issuing and serving a subpoena on Marsha's aunt. The attached subpoena duces tecum requested that Marsha's aunt produce, pursuant to rule 34A, documents similar to those requested of Marsha. The court denied these motions along with the motion for pretrial hearing, stating that Lloyd's counsel had sufficient time to conduct discovery and that Lloyd had not requested a continuance of the hearing. Again, we find no error in the court's ruling concerning discovery in light of Lloyd's assertions concerning a speedy adjudication.

(e) Adjudication Under § 43-247(3)(a)

Lloyd claims that the court erred in finding that Maxwell was within § 43-247(3)(a) with respect to Lloyd. Lloyd asserts that the court's only basis for the adjudication was the fact that Lloyd was incarcerated, and Lloyd claims that it was error for the court to adjudicate Maxwell on this basis alone. Lloyd cites *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002), for the proposition that incarceration alone is insufficient, in the absence of other factors, to warrant the termination of a person's parental rights, and Lloyd asserts that this holding should be applied to an adjudication of a child pursuant

to § 43-247(3)(a). We conclude that there was sufficient evidence to support the court's order of adjudication.

In its supplemental petition, the State alleged that Maxwell was "lacking proper parental care by reason of the faults or habits of" Lloyd, in that Lloyd was currently incarcerated and unable to care for Maxwell, had had no contact with Maxwell for more than 6 months, and had failed to provide proper parental care for Maxwell, and in that because of those allegations, Maxwell was at risk for harm.

■ At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Heather R. et al.*, 269 Neb. 653, 694 N.W.2d 659 (2005); *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003); *In re Interest of T.M.B. et al.*, 241 Neb. 828, 491 N.W.2d 58 (1992). See § 43-279.01(3). At the adjudication hearing, the State presented evidence to support the allegations in the supplemental petition. Lewis testified that Lloyd would likely be incarcerated until 2009 and that Lloyd was unable to care for Maxwell while Lloyd was in the penitentiary. Lewis also testified that Lloyd had not had any contact with Maxwell for the 10 months that Lewis had been the caseworker. Lewis stated that in her opinion, Maxwell was at risk for harm because Lloyd left Maxwell in Marsha's care, at a time when Marsha was unable to care for him, and because Lloyd was unable to care for Maxwell while in the penitentiary. Having reviewed the evidence presented at the hearing, we conclude that the State provided sufficient evidence to prove the allegations of the supplemental petition by a preponderance of the evidence. We therefore reject Lloyd's final assignment of error.

## VI. CONCLUSION

We find that the juvenile court properly exercised temporary emergency jurisdiction in this case, but that the court must immediately communicate with the South Dakota court as required by the UCCJEA before proceeding further with this matter. Further, the juvenile court is without jurisdiction to render a permanent custody order unless the South Dakota court affirmatively declines jurisdiction or fails to take appropriate action.

Last, we find that the juvenile court did not err in the adjudication of the supplemental petition.

AFFIRMED IN PART, AND IN PART REMANDED WITH DIRECTIONS.