IN RE INTEREST OF THEODORE W., A CHILD UNDER 18 YEARS OF
AGE.
STATE OF NEBRASKA, APPELLEE, V. GEORGE W., SR.,
APPELLANT.
545 N.W.2d 119

Filed March 12, 1996. No. A-95-455.

Lisa Ferguson Lozano, of Aman, Aman & Lozano, Attorneys at Law, for appellant.

Carole McMahon–Boies, guardian ad litem, and Rod Reuter, Deputy Lancaster County Attorney, for appellee.

MILLER–LERMAN, Chief Judge, and IRWIN and MUES, Judges.

IRWIN, Judge.

## INTRODUCTION

George W., Sr. (George), appeals the order of the juvenile court terminating his parental rights to Theodore W. The natural mother of Theodore, Tonia M., relinquished her parental rights to Theodore and is not involved in this appeal. For the reasons stated below, we affirm.

## FACTUAL BACKGROUND

Theodore was born May 27, 1991. George and Tonia are his natural parents and have never been married. George has three other children, George W., Jr., born in August 1985; Galvin N., born in January 1989; and Jordan K., born in March 1989. These three children are not involved in the present case.

Theodore first entered the juvenile court system on December 11, 1991, when a petition was filed by the county attorney, alleging that Theodore was a juvenile as defined by Neb. Rev.

Stat. § 43-247(3)(a) (Reissue 1993) because he lacked proper parental care by reason of the faults or habits of his mother, Tonia. Tonia admitted several allegations of the petition. Theodore remained in Tonia's custody under the supervision of the Department of Social Services (DSS) until June 2, 1993. On June 4, the court approved Theodore's placement in DSS' custody, and he was placed in foster care, where he remained until trial. Although George was permitted to be involved in all proceedings, no allegations were made against him, and no plan was ordered for him. Throughout these proceedings, George was incarcerated.

On May 16, 1994, the guardian ad litem filed an "application" to terminate the parental rights of Tonia and George. This "application" was amended July 19. The amendments included changing the title of the pleading to "Amended Petition for Termination of Parental Rights." A trial on the amended petition began November 3. After a portion of the testimony was received, the judge recused herself because of a conflict of interest in that she had prosecuted George when she was a deputy county attorney.

A second amended petition to terminate the parental rights of Tonia and George was filed on December 5, 1994. Another juvenile judge presided over all proceedings regarding this petition, and Tonia and George were personally served. On January 25, 1995, Tonia and George were informed of their rights and the possible consequences of an action to terminate parental rights; they waived the reading of the second amended petition, and they entered their denials.

George filed a motion in limine in which he claimed that his criminal history prior to Theodore's birth was irrelevant to the issues before the court and that if his parental rights were terminated, the introduction of that criminal history would constitute double jeopardy. The court sustained the motion as to any convictions more than 10 years old, but overruled the remainder of the motion. At trial, George preserved his objections to the introduction of his criminal history. George also filed a "Motion to Vacate Adjudication of Jurisdiction" in which he claimed the order of adjudication of jurisdiction issued by the recused judge should be vacated for various reasons. This

motion was also overruled.

Trial was held March 27, 29, 30, and 31, 1995. The record comprises over 1,100 pages of testimony and numerous exhibits. We will summarize the relevant evidence elicited. On the first day of trial, Tonia executed a relinquishment of parental rights regarding Theodore and a consent for adoption in favor of Cindi R. and Mark R., Theodore's foster parents.

Testimony revealed that after Theodore's birth on May 27, 1991, George spent June 1 through 28 in jail for driving on a suspended license. On August 13, George was arrested for possession of crack cocaine with the intent to deliver, and he has remained incarcerated since that date. He was convicted and sentenced to 15 to 30 years' imprisonment. The parties stipulated that his earliest possible parole date is February 8, 1999.

George provided Tonia support during her pregnancy and was present for Theodore's birth. George helped Tonia care for Theodore prior to George's incarceration and saw him daily. Tonia testified that George gave her approximately $800 for Theodore during his first months in jail after Theodore was born.

During George's incarceration, Tonia brought Theodore to visit George on at least eight occasions. George made numerous requests for visitation to the DSS Child Protective Services worker in charge of Theodore's case, but he did not formally request an order granting visitation until March 2, 1995. George's first visit with Theodore after he was placed in DSS' custody was December 23, 1993. Through August 1994, DSS scheduled seven visits, and six occurred. The visits did not last longer than 20 minutes, and George never requested longer visits. The DSS workers who supervised the visits testified that George often spent the time talking with them and that Theodore would play with them and others present rather than play with George. Visitation ceased after an August 25, 1994, visit because the DSS worker felt that Theodore was having a "negative reaction." Theodore began moaning and went limp on the floor in a fetal position when he was told he was going to visit George that day. George never called Theodore or his foster parents or sent any gifts to Theodore. George did contact

the DSS worker in charge of Theodore's case to discuss visitation and George's concerns regarding Theodore's placement. George also sent birthday and Christmas cards.

George set up a bank account in Theodore's name to which he sent his prison earnings. The account, at times, contained nearly $200. Josie Y., Tonia's mother, had access to the account, and George would direct her to do various things with the money. At George's direction, Josie took out approximately $30 total during George's incarceration to provide things for Theodore. The last time she made such a withdrawal, except to buy Theodore snacks during visitation, was approximately 2 years prior to the trial, when she used approximately $10 to purchase him a pair of shoes and a coat. In addition, at George's direction, Josie took out money and sent money orders to George in prison.

George engaged in other criminal activity prior to Theodore's birth. In the 10 years prior to trial and prior to the birth of Theodore, George was incarcerated for, at least, the following periods of time: March 1985 to May 1986 for criminal trespass and escape; November 1988 to January 1990 for possession of a controlled substance with the intent to deliver; and May 1990 to June 1990 for a parole violation. He admitted at trial to being convicted, in that same 10-year period, 8 or 9 times for assault, 10 times for trespass, 4 times for shoplifting, numerous times for driving on a suspended license, 5 times for keeping a disorderly house, and 2 times for conditions likely to produce disease. For many of these convictions, he chose to "serve out" his time in jail rather than pay the fines.

Regarding his job history, George testified that the longest he held a job in the 10 years prior to trial was for 7 to 8 months. He held other jobs off and on for no more than a couple of months at a time. He had not worked since the summer of 1990. George admitted that he supported himself exclusively with drug sales in early 1991 and other times supported himself in part with drug sales.

According to George and his other witnesses, he spent significant amounts of time with his children and shared in their care. George testified that his children were not present when he was engaging in criminal activities, but according to a DSS

worker handling a case involving other children of George's, he had exposed them to drug use and sexual activity. There was no evidence that George provided financially for his children, other than Theodore, before or during his incarceration.

All parties agree that Theodore has bonded with his foster parents and that Theodore refers to them as his "mommy and daddy." Theodore refers to George as "my friend George."

The deposition of Dr. Rick McNeese, a psychologist, was read into evidence, and his testimony shows as follows: Theodore is an anxious, withdrawn child who needs security and consistency in parenting. Theodore's behavior shows the " 'effects of insecure and poor attachments in an important time in [his] life' " and of " 'inconsistent and deficient parenting.' " Theodore's response on August 25, 1994, when told he was going to visit George was " 'typical of an anxious, insecured [sic] child [with] a fear of some — some object or some event' " and is " 'evidence of an insecure attachment to that parental figure.' " Theodore has positive interactions with his foster parents and seems to have a positive emotional and secure attachment to them. Dr. McNeese opined that it was in Theodore's best interests that George's parental rights be terminated and that it would not be in Theodore's best interests to remain in foster care until George is released from prison.

Dr. McNeese stated that George's efforts to initiate contact with Theodore were positive. However, based upon a review of the records and George's history, Dr. McNeese was concerned with George's " 'chronic long-standing problem' " with behavioral control, his major antisocial characteristics, and his physical and psychological unavailability to Theodore. Dr. McNeese opined that after his release, George would need at least 3 to 5 years of long-term therapy to address these problems before he could be considered as a custodian for Theodore.

According to George, while in prison he has improved himself. He has violated no laws while in prison and has not used illegal drugs. He has successfully completed therapy for drug and alcohol abuse, which was a condition of eligibility for parole, and he expected to receive his GED in June 1995. He plans to take college courses after receiving his GED and would

like to be a counselor for children in gangs and with substance abuse problems.

In an order dated April 3, 1995, the juvenile court terminated George's parental rights to Theodore. The court found it had jurisdiction over the matter, the child, and the father. The court also found that George had been incarcerated for Theodore's entire life except for approximately 2 months, he had failed to provide for Theodore's emotional and monetary needs, he had exhibited a lifestyle over the past 10 years which prevented him from parenting Theodore, and he was unfit by reason of debauchery or repeated lewd or lascivious behavior, which conduct is seriously detrimental to Theodore's health, morals, and well-being. Based upon its findings, the court concluded that George had abandoned Theodore for 6 months or more immediately prior to the filing of the second amended petition and had substantially and continuously or repeatedly neglected him and refused to give him necessary parental care and protection. The court also found that termination of George's parental rights was in Theodore's best interests. This appeal timely followed.

## ASSIGNMENTS OF ERROR

George assigns as error the following actions of the juvenile court: determining there was clear and convincing evidence of one or more of the circumstances prescribed in Neb. Rev. Stat. § 43-292 (Reissue 1993); determining there was clear and convincing evidence that the termination of George's parental rights was in Theodore's best interests; overruling George's motion in limine and admitting into evidence, over objection, George's criminal history prior to the birth of Theodore; admitting into evidence, over objection, George's criminal history and lifestyle more than 10 years prior to the birth of Theodore; overruling George's "Motion to Vacate Adjudication of Jurisdiction"; and violating George's due process rights and placing him in double jeopardy.

## STANDARDS OF REVIEW

An appellate court must decide a case involving termination of parental rights de novo on the record. An appellate court is required to reach a conclusion independent of

the findings of the juvenile court, but, when evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed witnesses and accepted one version of the facts rather than another. *In re Interest of Constance G.*, 247 Neb. 629, 529 N.W.2d 534 (1995); *In re Interest of J.T.B. and H.J.T.*, 245 Neb. 624, 514 N.W.2d 635 (1994). With respect to matters of law, an appellate court reaches independent conclusions. *In re Interest of A.K.*, 2 Neb. App. 662, 513 N.W.2d 42 (1994).

## ANALYSIS

*Evidence of George's Criminal History.*

George claims in two separate assignments of error that evidence of his criminal history prior to Theodore's birth should not have been allowed. First, he assigns that evidence of his criminal record and lifestyle more than 10 years old should not have been allowed as evidence. This assignment is without merit. The trial court sustained his motion in limine on this basis, and such evidence was not allowed at trial.

We address George's assignment that his criminal history for the 10 years prior to trial was improperly allowed as evidence. George argues that this evidence was irrelevant and prejudicial because it occurred prior to Theodore's birth. George also separately assigns that the admission of this evidence violated his due process rights. We will consider these claims together. We note that George cites no authority stating that a juvenile court cannot look to a parent's behavioral history predating the birth of the juvenile.

The strict rules of evidence do not apply to proceedings to terminate parental rights. See *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991). The requirements of due process control a proceeding to terminate parental rights and the type of evidence which may be used by the State in an attempt to prove that parental rights should be terminated. *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993). See, also, *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). In a termination proceeding, the State must provide the parents with fundamentally fair procedures. *In re Interest of*

*Tina L.K. & Billy M.*, 3 Neb. App. 483, 528 N.W.2d 357 (1995). See *In re Interest of D.J. et al.*, 224 Neb. 226, 397 N.W.2d 616 (1986).

" '[I]t is obvious that fundamental due process is difficult to define. With reference to the evidence that is to be considered in a parental rights termination case, it is further obvious that in determining whether or not fundamental due process has been afforded to all persons interested in the proceedings, the Nebraska Rules of Evidence provide a guidepost in that determination.' "

*In re Interest of J.H.*, 242 Neb. at 912, 497 N.W.2d at 352 (quoting *In re Interest of C.W. et al., supra*).

George first argues that his criminal history prior to Theodore's birth is irrelevant. Under Neb. Evid. R. 401, Neb. Rev. Stat. § 27–401 (Reissue 1989), evidence is relevant if it has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. Clearly, George's criminal history is relevant based upon the broad concerns of juvenile proceedings. We also conclude that the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice as urged by George. See Neb. Evid. R. 403, Neb. Rev. Stat. § 27–403 (Reissue 1989).

George also assigns that the admission of evidence of his criminal history violates his due process rights, namely his liberty interest in raising his child. See *In re Application of S.R.S. and M.B.S.*, 225 Neb. 759, 408 N.W.2d 272 (1987). His argument seems to be that the admission of this evidence was fundamentally unfair.

Our review of Nebraska jurisprudence shows that when reviewing juvenile proceedings, the Nebraska Supreme Court has considered evidence of a parent's conduct prior to the birth of the juvenile. See, e.g., *In re Interest of B.A.G.*, 235 Neb. 730, 457 N.W.2d 292 (1990); *In re Interest of M.L.B.*, 221 Neb. 396, 377 N.W.2d 521 (1985); *In re Interest of C.L.F.*, 216 Neb. 631, 344 N.W.2d 674 (1984); *In re Interest of Bird Head*, 213 Neb. 741, 331 N.W.2d 785 (1983); *In re Interest of Reed*, 212 Neb. 208, 322 N.W.2d 411 (1982); *In re Interest of Morford*, 207 Neb. 627, 300 N.W.2d 795 (1981). Based upon our de novo

review of the record before us, we cannot conclude that it was fundamentally unfair for evidence of George's criminal history to be admitted.

*Inadequate Advisement.*

■ We next address George's argument that he was denied due process because his criminal history was introduced against him at the termination hearing and he was not informed when he was convicted and sentenced for his crimes that the convictions could be used as a basis to terminate his parental rights. Based upon the record before us, we cannot determine the circumstances surrounding George's convictions. However, even if George pled guilty in one or more of his convictions, the criminal court was not required to inform him of such a potential consequence. Before accepting a guilty plea, a criminal court is required to inform a defendant of only the " 'penal consequences of the plea.' " *State v. Stastny*, 223 Neb. 903, 905, 395 N.W.2d 492, 494 (1986) (quoting *State v. Lewis*, 192 Neb. 518, 222 N.W.2d 815 (1974)). See, also, *State v. Irish*, 223 Neb. 814, 394 N.W.2d 879 (1986). Because juvenile proceedings are civil in nature, this assignment is without merit. See *In re Interest of A.M.H.*, 233 Neb. 610, 447 N.W.2d 40 (1989).

*Sufficiency of Evidence.*

■ George contends that the evidence is insufficient to sustain the juvenile court's finding that his parental rights should be terminated. To terminate parental rights, the State must show that such termination is in the child's best interests and that at least one of the seven statutory grounds for termination of parental rights under § 43-292 exists. The State must prove these elements by clear and convincing evidence, that is, by that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993).

The juvenile court found that two of the statutory grounds under § 43-292 justified the termination of George's parental rights: abandonment and neglect. The juvenile court also found

that termination of George's parental rights was in Theodore's best interests.

We first address whether there was sufficient evidence to terminate George's parental rights based upon abandonment. George seems to argue that the termination of his parental rights was based solely upon his incarceration and, therefore, improper. Abandonment, for the purpose of § 43–292(1), is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and opportunity for the display of parental affection for the child. *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992); *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990). The question of abandonment is largely one of intent, to be determined in each case from all of the facts and circumstances. *In re Interest of L.V., supra*; *In re Interest of B.A.G.*, 235 Neb. 730, 457 N.W.2d 292 (1990). Circumstantial evidence of intent may be used to establish abandonment. *In re Interest of C.A.*, 235 Neb. 893, 457 N.W.2d 822 (1990); *In re Interest of McCauley H.*, 3 Neb. App. 474, 529 N.W.2d 77 (1995).

The Nebraska Supreme Court has held that "parental incarceration may be considered in reference to abandonment as a basis for termination of parental rights." *In re Interest of L.V.*, 240 Neb. at 422, 482 N.W.2d at 261. However,

> "[i]ncarceration of a parent, standing alone, does not furnish a ground for automatic termination of parental rights. . . . Incarceration, however, does not insulate an inmate from the termination of his parental rights if the record contains the clear and convincing evidence that would support the termination of the rights of any other parent."

*Id.* at 418, 482 N.W.2d at 259 (quoting *In re Randy Scott B.*, 511 A.2d 450 (Me. 1986)). The court also quoted with approval the following language from *In re Pawling*, 101 Wash. 2d 392, 679 P.2d 916 (1984):

> "[I]n termination proceedings we do consider 'a parent's inability to perform his parental obligations because of imprisonment, the nature of the crime committed, as well as the person against whom the criminal act was perpe-

trated are all relevant to the issue of parental fitness and child welfare, as [is] the parent's conduct prior to imprisonment and during the period of incarceration.' . . ."
*In re Interest of L.V.*, 240 Neb. at 420, 482 N.W.2d at 260-61.

The Nebraska Supreme Court stated when considering a parent's incarceration for theft that "while the fact of incarceration was involuntary as far as [the mother] was concerned, her illegal activities leading to incarceration were voluntary on [her] part." *In re Interest of R.T. and R.T.*, 233 Neb. 483, 487, 446 N.W.2d 12, 16 (1989). In *In re Interest of M.L.B.*, 221 Neb. 396, 377 N.W.2d 521 (1985), the Nebraska Supreme Court upheld the termination of a mother's parental rights based upon the mother's many years of incarceration, lack of contributions to support, lack of gainful employment when not incarcerated, and lack of cooperation, even though the mother expressed interest in the child and sent the child small gifts.

Our de novo review of the record shows that George has been incarcerated for all but approximately 2 months of Theodore's life and will remain incarcerated until at least the year 1999. George is presently incarcerated for dealing drugs. According to George, he committed this crime while Tonia was pregnant with Theodore, and he was not gainfully employed during her pregnancy or the first months of Theodore's life. The record also shows that for most of his adult life George has voluntarily and intentionally engaged in criminal activities which led to periods of incarceration.

Although George proclaims he wants to be a parent to Theodore, it does not appear that George has provided or will provide the emotional, psychological, and financial support that Theodore needs. According to the record, for at least 2 years prior to trial, George did not provide financial support for Theodore, except money for snacks during visitation, although it appears George has some available resources. Although George requested visits, he never sought to lengthen the visits past 20 minutes. Furthermore, outside the brief and sporadic visits, George never sought to call Theodore and never wrote to him besides occasional birthday and Christmas cards.

 We note that the parental obligation is a positive duty which encompasses more than a financial obligation. It requires continuing interest in the child and a genuine effort to maintain communication and association with that child. *In re Interest of B.A.G.,* 235 Neb. 730, 457 N.W.2d 292 (1990). Furthermore, "[a]bandonment is not an ambulatory thing, the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child." *Id.* at 735, 457 N.W.2d at 296–97.

For these reasons, we conclude that the evidence clearly and convincingly established that George abandoned Theodore for a period of at least 6 months before the filing of the second amended petition without justifiable excuse. See § 43–292(1). In addition, considering all aspects of George's intentional conduct, we find, from our de novo review, that the evidence clearly and convincingly establishes that George has substantially and continuously or repeatedly neglected Theodore and has refused to provide parental care and protection for him, all without any justifiable reason or excuse for such parental failure. See § 43–292(2).

 George also argues that there was insufficient evidence that termination was in Theodore's best interests. The evidence shows that George has been incarcerated for essentially Theodore's entire life of 4½ years, will remain incarcerated until Theodore is almost 8 years old, and even when released, may still not be in a position to parent Theodore. Theodore views his foster parents as his "mommy and daddy" and refers to George as "my friend George." The evidence also shows that Theodore is doing well with his foster family, has advanced developmentally, and has developed secure attachments. A child cannot, and should not, be suspended in foster care, or be made to await uncertain parental maturity. *In re Interest of J.H.,* 242 Neb. 906, 497 N.W.2d 346 (1993). We conclude, based upon our review of the record, that the termination of George's parental rights is in Theodore's best interests.

*Double Jeopardy.*

George also assigns that the termination of his parental rights violates the Double Jeopardy Clause of the U.S. Constitution.

He seems to argue that he is being punished twice for his past crimes because he was already convicted and sentenced in the criminal system and these same convictions are now being used against him as a basis to terminate his parental rights.

It is fundamental that one objective of the Double Jeopardy Clause is to prevent multiple punishments for the same offense. See, *United States v. Halper*, 490 U.S. 435, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989); *State v. Hansen*, 249 Neb. 177, 542 N.W.2d 424 (1996). A civil penalty may constitute punishment for the purposes of double jeopardy. See, *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 114 S. Ct. 1937, 128 L. Ed. 2d 767 (1994); *Halper, supra*. *Halper* involved criminal charges and convictions followed by a civil lawsuit brought by the government, resulting in a monetary penalty. In *Halper*, the Court concluded that a legislative characterization of a sanction as civil does not preclude the possibility that the civil sanction could be a punishment under the Double Jeopardy Clause. The *Halper* Court held that "under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." 490 U.S. at 448-49.

Juvenile proceedings are civil in nature. See *In re Interest of A.M.H.*, 233 Neb. 610, 447 N.W.2d 40 (1989). According to its preamble, the Nebraska Juvenile Code is intended to effectuate the rights of juveniles to care, protection, and a stable living environment and to provide for intervention in the interest of the juvenile with due regard to parental rights. Neb. Rev. Stat. § 43-246 (Reissue 1993). In a case involving a claim that the juvenile was homeless, destitute, or without proper support through no fault of the parents, the Nebraska Supreme Court stated that a petition in juvenile court is "brought on behalf of the child, not to punish the parents." *In re Interest of Constance G.*, 247 Neb. 629, 635, 529 N.W.2d 534, 539 (1995). Based upon the foregoing, the present juvenile case was clearly remedial in nature and did not expose George to double jeopardy. See *Malone v. State*, 864 S.W.2d 156 (Tex. Crim. App. 1993) (holding termination of father's parental

rights to child was civil proceeding with remedial result not triggering double jeopardy for subsequent criminal proceeding).

*Recusal Issue.*

Finally, George claims that his motion to vacate adjudication of jurisdiction should have been granted. The basis for this motion was that the judge who presided over the adjudication and dispositional proceedings against Tonia and the first partial trial on the termination of his and Tonia's parental rights recused herself because of a conflict of interest.

It is unclear how a vacation of the adjudication order would affect George and this termination proceeding. The adjudication order involved a finding that Theodore was within the jurisdiction of the juvenile court because of actions of Tonia. After the first judge recused herself, a second amended petition for the termination of George's and Tonia's parental rights was filed and served, the parties were again informed of their rights and entered their denials, and a trial was had on this petition. Furthermore, where a case on appeal is tried de novo, refusal by the trial judge to disqualify himself or herself is immaterial. *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980); *Garrett v. Garrett*, 3 Neb. App. 384, 527 N.W.2d 213 (1995). This assignment is without merit.

For the reasons stated above, we affirm.

AFFIRMED.