781 N.W.2d 622 (2010)
18 Neb. App. 350
In re Interest of CARRDALE H. II, a child under 18 years of age.
State of Nebraska, appellee,
v.
Carrdale H., appellant.
No. A-09-953.
Court of Appeals of Nebraska.
April 27, 2010.
*623 Thomas C. Riley, Douglas County Public Defender, and Stephen P. Kraft, Omaha, for appellant.
Donald W. Kleine, Douglas County Attorney, and Jordan Boler for appellee.
INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.
SIEVERS, Judge.

INTRODUCTION
Carrdale H. appeals from an order of the separate juvenile court of Douglas County which took jurisdiction over his son, Carrdale H. II (the juvenile). On appeal, Carrdale challenges the sufficiency of the evidence to support adjudication under Neb.Rev.Stat. § 43-247(3)(a) (Reissue 2008).

STATEMENT OF FACTS
In May 2009, the State filed a motion for temporary custody, which was granted by the juvenile court. The State filed its amended petition in July 2009, in which it alleged that the juvenile lacked proper parental care and supervision by reason of the habits of his mother and Carrdale. Because the mother has not appealed in this matter, it is unnecessary to discuss the allegations against her. The petition alleged that the juvenile was at risk of harm because of Carrdale's use of alcohol and/or controlled substances, because Carrdale engages in domestic violence with the juvenile's mother in the presence of the juvenile, and because Carrdale had failed to provide the juvenile with safe, stable, and appropriate housing.
The hearing in this case was based on a few stipulated facts: The juvenile was born in October 2008, Carrdale is his biological *624 father, and a substance which proved to be .3 of a gram of crack cocaine was found in Carrdale's possession in March 2009. The remaining allegations in the petition against Carrdale, such as domestic violence, were dismissed. After brief arguments by counsel, the juvenile court found that the juvenile, less than 1 year old at the time of the hearing, was harmed by Carrdale's possession of illegal drugs. The court noted that such possession subjects Carrdale to arrest and the inability to care for the juvenile. The juvenile was adjudicated under § 43-247(3)(a). Carrdale filed a motion to reconsider, which the separate juvenile court denied. Carrdale has timely appealed to this court.

ASSIGNMENT OF ERROR
Carrdale asserts that there was insufficient evidence to adjudicate the juvenile within the meaning of § 43-247(3)(a).

STANDARD OF REVIEW
Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. In re Interest of Angelica L. & Daniel L., 277 Neb. 984, 767 N.W.2d 74 (2009).

ANALYSIS
Carrdale contends that the fact of his possession of a small amount of crack cocaine is insufficient to warrant the juvenile court's adjudication of the juvenile under § 43-247(3)(a). Carrdale directs us to In re Interest of Brianna B. & Shelby B., 9 Neb.App. 529, 614 N.W.2d 790 (2000), a case in which a father appealed from an adjudication of his two children under § 43-247(3)(a) on the basis of his alcohol use. As summarized, the evidence in that case established a pattern of drinking. This court found that although the evidence showed that the parents had consumed alcohol on occasions when the children were in the house, there was no evidence presented to show any impact such drinking had on the children. The juvenile court's order of adjudication was reversed.
Carrdale argues that his case is analogous to In re Interest of Brianna B. & Shelby B. because there was no evidence to establish that his actions had any impact on the juvenile. We agree that it is. However, it is important to note one distinction. In In re Interest of Brianna B. & Shelby B., the conduct of the parents was not illegal, whereas Carrdale had an illegal substance in his possession, which is a Class IV felony. See Neb.Rev.Stat. § 28-416(3) (Reissue 2008). The juvenile court based its decision upon this fact and reasoned that because Carrdale's actions subjected him to arrest, the juvenile was subjected to the risk that Carrdale could not properly care for him.
Generally, the State need not prove that the juvenile has actually suffered harm but must establish that without intervention, there is a definite risk of future harm. See, e.g., In re Interest of Anaya, 276 Neb. 825, 758 N.W.2d 10 (2008). In In re Interest of Anaya, the Nebraska Supreme Court found that the parents' failure to submit their infant to mandatory blood testing required by Neb.Rev.Stat. § 71-519 (Reissue 2009) did not, standing alone, establish neglect to warrant adjudication under § 43-247(3)(a). By refusing to submit their child to the blood test, the parents engaged in illegal activity. The mandatory blood testing is enforced through civil proceedings and "any other remedies which may be available by law" pursuant to Neb.Rev.Stat. § 71-524 (Reissue 2009). Similarly, Carrdale's offense, if he was in fact charged and convicted, may result in imprisonment, but of course, he *625 could also be convicted and placed on probation. See Neb.Rev.Stat. § 28-105 (Reissue 2008).
In prior cases, we have determined that a showing that the parent is in prison and thereby unable to care for his child may be sufficient for adjudication under § 43-247(3)(a). See In re Interest of Maxwell T., 15 Neb.App. 47, 721 N.W.2d 676 (2006) (father who was incarcerated prior to and at time of State's petition, had not had contact with his son for 6 months, and had left son in care of someone who was unable to care for him was properly adjudicated because juvenile was lacking proper parental care due to faults or habits of father). Likewise, in the context of cases involving termination of parental rights, the appellate courts have often held that while incarceration alone cannot serve as the basis for the termination of parental rights, when a parent voluntarily engages in illegal activity leading to incarceration, the court may consider the parent's inability to perform his or her parental obligations because of imprisonment. See In re Interest of Theodore W., 4 Neb.App. 428, 545 N.W.2d 119 (1996).
But, here, the State failed to adduce any evidence whether Carrdale was actually charged with an offense, and thus there obviously was no conviction and incarceration. Furthermore, § 28-105 does not require imprisonment for a Class IV felony, but, rather, there is no minimum prison term prescribed by the statute. The State also failed to adduce whether there was any history of drug use either away from or in the presence of the juvenile, whether Carrdale had prior drug- or alcohol-related offenses, whether the juvenile was present when Carrdale had drugs in his possession, whether the juvenile was in any way affected by Carrdale's actions, or any other such information that allows a reasonable inference that Carrdale's "use of alcohol and/or controlled substances places said child at risk for harm" as alleged in the amended petition. Based only upon an exhibit showing that Carrdale had a controlled substance in his possession in March 2009, and without evidence of charges filed or a sentence imposed or any impact on the juvenile, the risk of harm to the juvenile cannot be considered "definite." At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. In re Interest of Rebekah T. et al., 11 Neb.App. 507, 654 N.W.2d 744 (2002). Based upon our de novo review, we find that the juvenile court erred in finding that the limited evidence presented at the adjudication hearing proved the allegation in the petition by a preponderance of the evidence.
If the pleadings and evidence at the adjudication hearing do not justify a juvenile court's acquiring jurisdiction of a child, then the juvenile court has no jurisdiction, i.e., no power to order compliance with a rehabilitation plan and no power over the parent or child at the disposition hearing unless jurisdiction is alleged and proved by new facts at a new adjudication-disposition hearing. See In re Interest of D.M.B., 240 Neb. 349, 481 N.W.2d 905 (1992). Therefore, we remand the cause with directions to dismiss the petition because the juvenile court does not have jurisdiction.
But, our respected colleague's dissent demands a response. While in the "Internet age" one can readily access virtually unlimited sources and amounts of information, we do not think that our jurisprudence has now evolved to the point that a judge can plug the gaps in a State's burden of proof by quotations obtained by Internet research. If we have reached *626 that point, then the notion that judges in our decisionmaking process are limited to consideration of only the evidence in the record becomes essentially meaningless. We strongly believe that we are limited to the evidence in the record. Here, the State chose to limit its evidence to the solitary fact that on one occasion, Carrdale possessed a small amount of crack cocaine. The dissent concludes from such solitary fact that "the strongest inference flowing from Carrdale's possession of this drug is that he had used it in the past and intended to do so again." How this is not purely speculation escapes us. From this truly uninformative record, one could likewise speculate that this was the first time he had ever possessed the drug, or that he was "holding" for someone else. The dissent, when reduced to its essence, simply would hold that "parental possession of drugs is enough to adjudicate" and that no evidence is needed that the child is being neglected, that the child is lacking in proper parental care, or that the father is a habitual user or dealer of drugs such that we can conclude, from the evidence, that the risk of harm to the child justifies the intervention of the State in the parent-child relationship. Obviously, we are well aware that the court need not await harm or tragedy to the child before such intervention can occur, but we cannot accept the proposition that the mere stipulation that a father possessed a small amount of crack cocaine on one occasion, without more, satisfies the State's burden of proof for adjudication.

CONCLUSION
The State failed to show, by a preponderance of the evidence, that Carrdale's use of alcohol and/or controlled substances placed the juvenile at risk of harm. Thus, because we find there was insufficient evidence presented to warrant an adjudication of the juvenile as concerns Carrdale, we reverse the adjudication order and remand the cause with directions to dismiss.
REVERSED AND REMANDED WITH DIRECTIONS TO DISMISS.
CASSEL, Judge, dissenting.
A parent who possesses crack cocaine places his or her child at substantial risk of harm. The majority opinion, however well intended, refuses to accept this simple reality. Although, as Justice Holmes famously observed, the life of the law has been experience, the majority opinion disregards human experience with crack cocaine and other such drugs. While many legal questions are complex and nuanced, I find no such complexity here. Therefore, I respectfully dissent.
I disagree with the majority opinion for four reasons. First, the majority fails to heed the rule that a court need not wait until disaster has befallen a minor child before the court may acquire jurisdiction. Second, the majority inappropriately equates possession of crack cocaine to a parent's religiously motivated resistance to government-mandated blood testing of an infant child. Third, the majority overlooks the many cases involving drug use that have come before the Nebraska appellate courts and that illustrate the devastation of children's lives caused by a parent's involvement with illegal drugs. Finally, numerous federal and state government reports demonstrate the enormous costs suffered by society, as well as the individual children involved, from parental use of illegal drugs. I now discuss each reason in greater detail.
There is no requirement that a juvenile court wait until disaster has befallen a minor child before the court may acquire jurisdiction. If it is reasonable to assume that injury will occur absent action by the court, then the court may assume jurisdiction *627 and act accordingly. In re Interest of Joshua M. et al., 251 Neb. 614, 558 N.W.2d 548 (1997). Carrdale H. stipulated that .3 of a gram of crack cocaine was found in his possession in March 2009. By far, the strongest inference flowing from Carrdale's possession of this drug is that he had used it in the past and intended to do so again. This inference satisfies the burden of proof for adjudication of the child, which at this stage requires only a preponderance of the evidence. At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under Neb.Rev.Stat. § 43-247(3)(a) (Reissue 2008), the State must prove the allegations of the petition by a preponderance of the evidence. In re Interest of Heather R. et al., 269 Neb. 653, 694 N.W.2d 659 (2005). The purpose of the adjudication phase of a juvenile proceeding is to protect the interests of the child. The parents' rights are determined at the dispositional phase, not at the adjudication phase. Id. The probability of harm to the child follows naturally from the nature of the parent's problem. It is more than reasonable to assume that absent action by the juvenile court, the possession of crack cocaine by the parent will lead to injury to the child. The majority opinion fails to recognize this train of logic.
The majority opinion equates possession of crack cocaine to a parent's religiously motivated resistance to government-mandated blood testing of an infant child. This comparison is inapposite. In In re Interest of Anaya, 276 Neb. 825, 758 N.W.2d 10 (2008), upon which the majority relies, the Nebraska Supreme Court confronted an attempt by the State to use the juvenile code to address the parents' failure to submit their infant to mandatory blood testing required by Neb.Rev.Stat. § 71-519 (Reissue 2009). Although Neb. Rev.Stat. § 71-524 (Reissue 2009) afforded a direct remedy to the State for the parents' failure to submit the child for testing, the State chose to proceed under the juvenile code despite the clear absence of any other evidence of abuse or neglect. The majority opinion in the case before us effectively treats the parents' sincerely held religious beliefs in In re Interest of Anaya the same as Carrdale's possession of crack cocaine. To me, the difference is profound and self-evident. Both case law and social literature are replete with examples of harm befalling children as a direct result of a parent's use of illegal drugs. I have been unable to find any case law or general literature documenting harm actually resulting from a parent's refusal to implement a government-mandated test of an infant's blood.
The critical questionwhether it is reasonable to assume that injury will occur absent action by the courtrequires one to consider human experience bearing on the situation. In doing so, I first look to Nebraska case law, which repeatedly describes the effect of such drugs as crack cocaine upon children and families. This court and the Nebraska Supreme Court have seen numerous juvenile cases involving the abuse and neglect of children due to a parent's involvement with illegal drugs, thus demonstrating that parental substance abuse is a significant issue in the juvenile court system. See, e.g., In re Interest of Michael B. et al., 258 Neb. 545, 604 N.W.2d 405 (2000) (affirming termination of mother's parental rights in part due to her habitual use of illegal drugs); In re Interest of Kantril P. & Chenelle P., 257 Neb. 450, 598 N.W.2d 729 (1999) (affirming termination of mother's parental rights in part because mother used cocaine and refused to comply with court's order to participate in drug dependency treatment program); In re Interest of Joshua M. et al., 256 Neb. 596, 591 N.W.2d 557 (1999) (concluding mother's parental rights *628 were properly terminated where mother was unfit due to her habitual use of narcotic drugs); In re Interest of H.P.A., 237 Neb. 410, 466 N.W.2d 90 (1991) (affirming termination of mother's parental rights where mother used marijuana on nearly daily basis and used other drugs when available); In re Interest of Eden K. & Allison L., 14 Neb.App. 867, 717 N.W.2d 507 (2006) (testimony and evidence provided that mother's use of methamphetamine impaired ability to provide proper parenting and that mother was not in position to parent due to incarceration for check forgery and drug charges, but this court reversed juvenile court's order terminating mother's parental rights); In re Interest of Stacey D. & Shannon D., 12 Neb.App. 707, 684 N.W.2d 594 (2004) (affirming termination of mother's parental rights where mother failed to demonstrate capability of caring for her children without presence of drugs in her life despite being given approximately 3 years to do so); In re Interest of Brook P. et al., 10 Neb App. 577, 634 N.W.2d 290 (2001) (affirming termination of parental rights where parents used drugs repeatedly over many years and were unable to abstain from them despite extensive help); In re Interest of Theodore W., 4 Neb.App. 428, 545 N.W.2d 119 (1996) (affirming termination of father's parental rights where, approximately 2½ months after child's birth, father was arrested for possession of crack cocaine with intent to deliver and would remain incarcerated until child was almost 8 years old). These cases clearly demonstrate the reasonableness of the assumption that absent court action, injury to the child will follow from Carrdale's possession of crack cocaine.
I find another source of accumulated human experience in government reports describing such drugs and their effects upon parents and children. These reports make evident the societal costs due to a parent's use of illegal drugs and the harm thereby resulting to children. As aptly explained by the National Center on Addiction and Substance Abuse at Columbia University,
[t]he human costs are incalculable: broken families; children who are malnourished; babies who are neglected, beaten and sometimes killed by alcohol-and crack-addicted parents; eight-year-olds sent out to steal or buy drugs for addicted parents; sick children wallowing in unsanitary conditions; child victims of sodomy, rape and incest; children in such agony and despair that they themselves resort to drugs and alcohol for relief. For some of these children it may be possible to cauterize the bleeding, but the scars of drug- and alcohol-spawned parental abuse and neglect are likely to be permanent.
No Safe Haven: Children of Substance-Abusing Parents at ii (Jan. 1999), http:// www.eric.ed.gov/ERICDocs/data/ericdocs2 sql/content_storage_01/0000019b/80/16/cd/ a9.pdf (last visited Apr. 16, 2010).
Substance abusers often abandon or neglect their children because their primary focus is obtaining and using drugs or alcohol. They also place their children's safety and well-being at risk when they buy drugs or engage in other criminal activity to support their drug habit. Recovery from drug and alcohol addiction is generally a difficult and lifelong process that may involve periods of relapse.
U.S. General Accounting Office, Foster Care: Agencies Face Challenges Securing Stable Homes for Children of Substance Abusers at 2 (Sept. 1998), http://www.gao. gov/archive/1998/he98182.pdf (last visited Apr. 16, 2010).
Parents who use hard drugs may be unable to meet even the basic needs of their children. Their use of hard drugs *629 can lead to erratic behavior that places the safety and well-being of their children at risk. For example, the immediate effects of both crack-cocaine and crystallized methamphetamines include hyperstimulation and an amplified sense of euphoria. Crack-cocaine users may also experience feelings of depression, restlessness, irritability, and anxiety, and prolonged use can lead to paranoid behavior.
Id. at 14.
Most children with substance-abusing parents enter foster care because their parents fail to meet their basic physical and emotional needs.... Because of the nature of addiction, obtaining and using drugs or alcohol are the most important focus in the lives of substance abusers. As a consequence, the safety and well-being of their children is often secondary to their addiction. Research suggests that substance-abusing parents of children in foster care do not always form healthy emotional attachments with their children and may have limited parenting skills. These parents may abandon their children at birth or sometime later in their lives, be periodically absent from the home, or leave their children in unsafe environments.
Id. at 14-15.
Children of substance-abusing parents often come to the attention of the child welfare system at birth due to prenatal substance exposure or later in life when they are found to have been abused or neglected. U.S. General Accounting Office, Parental Substance Abuse: Implications for Children, the Child Welfare System, and Foster Care Outcomes (Oct. 28, 1997), http://www.gao.gov/archive/1998/he 98040t.pdf (last visited Apr. 16, 2010). One report stated that children whose parents abuse alcohol or drugs are almost three times more likely to be verbally, physically, or sexually abused and four times more likely to be neglected. U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration's Center for Substance Abuse Treatment, You Can Help: A Guide for Caring Adults Working with Young People Experiencing Addiction in the Family, http://csat.samhsa.gov/ publications/youcanhelp.aspx (last visited Apr. 16, 2010). A publication of the U.S. Department of Health and Human Services reported that parents with substance abuse problems are more likely than other parents to maltreat their children and that between one-third and two-thirds of substantiated child abuse and neglect reports involved substance abuse. Blending Perspectives and Building Common Ground: A Report to Congress on Substance Abuse and Child Protection (Apr. 1999), http:// aspe.hhs.gov/HSP/subabuse99/chap4.htm (last visited Apr. 16, 2010). Further, children from substance-abusing households were more likely than others to be served in foster care rather than in the home, spent longer periods of time in foster care, and were less likely to have left foster care within 1 year. Id. In a January 1999 report, the National Center on Addiction and Substance Abuse at Columbia University estimated that drug abuse caused or contributed to 7 of 10 cases of child maltreatment and accounted for approximately $10 billion in federal, state, and local government spending on child welfare programs. http://www.ncjrs.gov/ ondcppubs/publications/policy/ndcs00/chap 2_9.html (last visited Apr. 16, 2010). Another study estimates that $5.3 billion of annual state spending goes toward child welfare costs associated with substance abuse. U.S. Department of Health and Human Services, Parental Substance Use and the Child Welfare System (Jan. 2009), http://www.childwelfare.gov/pubs/ *630 factsheets/parentalsubabuse.pdf (last visited Apr. 16, 2010).
This is but a sample of the information available in government reports found via the Internet and is by no means exhaustive. See, also, U.S. General Accounting Office, Foster Care: Parental Drug Abuse Has Alarming Impact on Young Children (Apr. 1994), http://archive.gao.gov/t2pbat3/ 151435.pdf (last visited Apr. 16, 2010); U.S. General Accounting Office, Child Protective Services: Complex Challenges Require New Strategies (July 1997), http:// www.gao.gov/archive/1997/he97115.pdf (last visited Apr. 16, 2010); U.S. Department of Health and Human Services, Substance Abuse Among Women and Parents (July 1994), http://aspe.hhs.gov/hsp/cyp/ xsfamdrg.htm (last visited Apr. 16, 2010); Jill Goldman et al., U.S. Department of Health and Human Services, A Coordinated Response to Child Abuse and Neglect: The Foundation for Practice (2003), http:// www.childwelfare.gov/pubs/usermanuals/ foundation/foundation.pdf (last visited Apr. 16, 2010); Nancy K. Young et al., U.S. Department of Health and Human Services, Screening and Assessment for Family Engagement, Retention, and Recovery (SAFERR) (2007), http://download.ncadi. samhsa.gov/prevline/pdfs/SMA07-4261.pdf (last visited Apr. 16, 2010); Nancy K. Young et al., National Center on Substance Abuse and Child Welfare, A Review of Alcohol and Other Drug Issues in the States' Child and Family Services Reviews and Program Improvement Plans (Nov. 2005), http://www.ncsacw.samhsa.gov/files/ SummaryofCFSRs.pdf (last visited Apr. 16, 2010).
The harm resulting to children from use of illegal drugs has also been well documented in Nebraska. Here, nearly 77 percent of children reviewed in 2005 who were under 3 years old had parental substance abuse as a factor for removal from the parental home. Carolyn K. Stitt, Nebraska Foster Care Review Board, 2005 Annual Report, Hope is On the Horizon, http://www.fcrb.nebraska.gov/pdf/ publications/archive/2005%20Annual%20 Report%20-main%20body.pdf (last visited Apr. 16, 2010). Among the barriers to permanency for children with a plan of reunification, parental substance abuse affected the greatest number of children. Report to Governor Dave Heineman on the Special Research Project on Young Foster Children Conducted by the Foster Care Review Board August 2006-January 2007, http://www.fcrb.nebraska.gov/pdf/ publications/special/2006%20special%20 study%20on%20children%20birth%20-%20five.pdf (last visited Apr. 16, 2010).
The state and federal government reports reinforce the basic premise supporting the juvenile court's decision: Carrdale's possession of crack cocaine placed his child at substantial risk of harm.
Contrary to the majority opinion's suggestion, I have not relied on facts outside the record. I rely solely upon the stipulated fact that Carrdale possessed crack cocaine and upon the reasonable inferences that flow from the stipulated fact. The finder of fact may draw reasonable inferences from the facts and circumstances proved. Jindra v. Clayton, 247 Neb. 597, 529 N.W.2d 523 (1995). From the stipulated fact, I draw the reasonable inferences that Carrdale used crack cocaine in the past and intends to do so in the future. While the majority may believe it is equally likely that this was the first time he possessed the drug or that he was "`holding'" it for someone else, I respectfully disagree. I contend that in the light of human experience, my inferences are reasonable.
The majority's search for "evidence ... that the child is being neglected, that the child is lacking in proper parental care, or *631 that the father is a habitual user or dealer of drugs" demonstrates its reluctance to implement the applicable rule. If it is reasonable to assume that injury will occur absent action by the court, then the court may assume jurisdiction and act accordingly. In re Interest of Joshua M. et al., 251 Neb. 614, 558 N.W.2d 548 (1997). I find it reasonable to assume that Carrdale's possession of crack cocaine will result in harm to the child, while the majority does not. I contend that the weight of human experience, as described in the extensive cases and government reports cited above, firmly establishes that my assumption is the reasonable one. It therefore follows that the juvenile court was empowered to assume jurisdiction and act accordingly. I would affirm the juvenile court's decision doing so.