IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AHANA C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AHANA C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

DYMOND C., APPELLANT, AND TRENTON O., APPELLEE AND CROSS-APPELLANT.

Filed February 23, 2021.    No. A-20-641.

Appeal from the Separate Juvenile Court of Lancaster County: ELISE M. W. WHITE, Judge. Affirmed.

Stephanie Flynn, of Stephanie Flynn Law Office, P.C., L.L.O., for appellant.

Patrick F. Condon, Lancaster County Attorney, and Amber L. Schlote for appellee State of Nebraska.

Angelica W. McClure, of Kotik & McClure Law, for appellee Trenton O.

MOORE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

### INTRODUCTION

Dymond C. appeals, and Trenton O. cross-appeals, from the decision of the separate juvenile court of Lancaster County adjudicating their daughter, Ahana C., pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). We affirm.

### BACKGROUND

Dymond and Trenton are the parents of Ahana, born in 2012. On the evening of May 14, 2020, Dymond and Trenton were residing at a hotel in Lincoln, Nebraska, with Ahana when they

were arrested for drug and other offenses. Ahana was taken into the emergency temporary custody of the Nebraska Department of Health and Human Services and placed with a relative.

On May 18, 2020, the State filed a petition in the juvenile court alleging that Ahana was a child within the meaning of § 43-247(3)(a). In count I of the petition, the State alleged that Ahana lacked proper parental care by reason of the fault or habits of Dymond, and/or that she was in a situation injurious to her health or morals in that:

> 1) On or about May 14, 2020, investigators with the Lincoln/Lancaster County Narcotics Task Force arrested Trenton . . . and **Dymond** . . . outside [a hotel], and executed a search warrant for rooms #102, #104, and #106, which were joined together and rented by Trenton . . . and/or **Dymond** . . . ;
>
> 2) [Ahana was] in the rooms, and there was food waste and dog feces throughout the rooms, with no clean area for [her] to sleep[;]
>
> 3) Investigators located marijuana, drug paraphernalia, a methamphetamine pipe with residue that pre-tested positive for amphetamines/methamphetamine, and a firearm in the rooms. All of these items were accessible to [Ahana];
>
> 4) The actions of **Dymond** . . . and/or the above situation places [Ahana] at risk of harm; and
>
> 5) All events occurred in Lancaster County, Nebraska.

(Emphasis in original.) In count II of the petition, the State alleged that Ahana lacked proper parental care by reason of the fault or habits of Trenton, and/or that she was in a situation injurious to her health or morals, alleging the same specific allegations as set forth in count I, except that in subpart four, the State alleged that "[t]he actions of **Trenton** . . . and/or the above situation places [Ahana] at risk of harm." (Emphasis in original.)

A contested adjudication hearing was held on August 7, 2020. In its journal entry and order filed that same day, the juvenile court "sustain[ed]" the allegations in the petition and adjudicated Ahana accordingly.

Dymond appeals, and Trenton cross-appeals, the juvenile court's order.

ASSIGNMENTS OF ERROR

Dymond and Trenton each assign, restated, that the juvenile court erred in finding that their actions placed Ahana at risk of harm.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

### LEGAL PRINCIPLES

Pursuant to § 43-247(3)(a), and as relevant here, the juvenile court in each county shall have jurisdiction of any juvenile who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; or who is in a situation dangerous to life or limb or injurious to the health or morals of such juvenile.

In order to obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L., supra*. The purpose of the adjudication phase is to protect the interests of the child. *Id*. The Nebraska Juvenile Code does not require the separate juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. *In re Interest of Kane L. & Carter L., supra.* While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id*. The State must prove such allegations by a preponderance of the evidence. *Id*. See, also, *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 743, 936 N.W.2d 733, 742 (2020) ("'preponderance of the evidence' . . . is the equivalent of the greater weight of the evidence"; "greater weight of the evidence means evidence sufficient to make a claim more likely true than not true").

### TESTIMONY FROM ADJUDICATION HEARING

At the contested adjudication hearing, two witnesses testified, but neither Dymond nor Trenton testified. No exhibits were offered or received into evidence at the adjudication hearing.

Investigator Christopher Eirich of the Lincoln Police Department testified that on May 14, 2020, he was conducting surveillance at a hotel in Lincoln. He was looking for a vehicle that was believed to be bringing methamphetamine from Colorado. He observed Dymond and Trenton standing outside of the parked vehicle. Investigator Eirich and another investigator displayed their badges, announced themselves as police officers, and ordered Trenton to get down onto the ground as they believed he had been involved in a high-speed vehicle pursuit with the State Patrol just prior. Trenton was placed in handcuffs and was initially cooperative. However, as the investigators stood Trenton up and began patting him down for weapons, he became verbally belligerent and began thrashing. Dymond was standing several feet away, but began to try to interfere and was "encouraging" Trenton to fight with the investigators. Trenton attempted to "headbutt" them. Investigator Eirich placed Trenton in a headlock and pulled him to the ground while Trenton was kicking at the other investigator, who had to apply a "drive stun with his taser" to Trenton's abdominal area in order to gain Trenton's compliance. During the incident, Dymond's mother, as well as approximately 20 to 30 other individuals also began yelling and screaming and encouraging Trenton's combative behavior. The situation was not under full control until numerous marked and uniformed police units arrived at the location several minutes later.

Once was situation was under control, Investigator Eirich performed a search incident to arrest on Trenton, and located a small amount of cocaine in a baggie in his pocket and more than $2,000 in cash. Additionally, Investigator Eirich observed marijuana in plain view through the

window of the vehicle that Dymond and Trenton had been standing beside. A search of that vehicle was then performed, and inside of the vehicle was paperwork with Dymond's and Trenton's names linking them to rooms 102, 104, and 106 of the hotel.

Investigator Eirich then spoke with a relative of Trenton's, who stated that he lived in a separate room at the hotel and that while the incident was occurring in the parking lot, he came down to Dymond and Trenton's room to check on Ahana, who was in their room at that time, to make sure that she was okay.

According to Investigator Eirich, rooms 102, 104, and 106 were "essentially one large suite." He stated, "Basically, they at one time were all separate rooms. The walls that connect them have been removed or they have doors leading to one another. They've been fashioned into one large room. They have separate exterior doors but they only use the door for 104." The kitchen was located in room 102, there were beds in rooms 102 and 104, and "a sort of a bunk style bed" in room 106. On cross-examination, Investigator Eirich was asked if the doors between the three rooms were intact at the time, and he responded, "They were all open or removed, one or the other. All three rooms were interconnected and movement was free throughout all three rooms." When asked if there were locks on the doors, he said, "No."

An initial sweep of the rooms was conducted. Investigator Eirich stated that during the initial sweep, "we did observe, like, dispensary containers, marijuana dispensary containers from Colorado, and we observed a firearm"; Investigator Eirich was aware that Trenton was a convicted felon. A search warrant was then obtained and executed. During the search of the rooms, "There were numerous items of drug paraphernalia located, again, dispensary containers with marijuana residue, methamphetamine pipes with methamphetamine residue," a "Bolt-Action 22 long rifle and items bearing both [Dymond's] name and [Trenton's] name." He stated, "There [were] baggies of suspected meth residue," "[t]here was a small amount of THC wax," "[t]here were digital scales," "[a]ll items that are utilized for the distribution of controlled substances." The rifle and drug paraphernalia were located in room 106, but Investigator Eirich did not observe any barriers between the units that would have prevented Ahana from traveling between the three rooms; Investigator Eirich acknowledged that the gun was not loaded. Additionally, Investigator Eirich observed "there was not a bed inside that was clear," "[t]he entirety of the suite, all three rooms, was completely littered with trash, [and] used food," there were "flies and other bugs that were surrounding the food that was lying around," and "[t]here was dog feces all over the floor"; he did not know how long the two dogs had been in the room.

Dymond and Trenton were arrested and taken down to headquarters where they were interviewed. Trenton admitted that he had gone to Colorado to buy marijuana. Both admitted to being involved in the use and sale of controlled substances. And both admitted to having smoked methamphetamine in their room days prior. When asked if the use and sale of drugs causes potential risks of harm to children, Investigator Eirich responded, "Yes." He stated:

> From a use standpoint, obviously when you're high on a controlled substance, you're not in a sober frame of mind. . . . [I]t causes psychosis. It can cause paranoia, inability to properly make decisions. From the sale standpoint, you're putting yourself and the children in jeopardy of, essentially, potentially being robbed by potential customers,

other dealers. Essentially, guns and drugs go hand in hand as violence and crime are associated with the sale of controlled substances.

Martina A. is Dymond's friend and resided at the same hotel. Martina testified that on May 14, 2020, she spent the day with Dymond and Ahana in Dymond's room. Martina helped Dymond do laundry and they "threw most of it on [the] beds." She also helped Dymond pick up the rooms.

According to Martina's testimony, rooms 102 and 104 were open to one another and there was no door separating the two rooms. However, there was a door separating rooms 104 and 106, and there was a hook type lock on the room 106 side of the door. There was a gap between the top of the door and the door frame, "enough for [a] hand to go through." Martina stated, "[T]he door didn't come all the way to the top . . . so if you had to be on that side, he can put his hand on that side and pull it up to get in there." When asked how high up from the floor the gap was, she responded, "I would say about as tall as I am and I'm 5′3[″]"; Martina was not able to reach over the door and unlatch the hook if she was standing on the floor and Ahana was shorter than Martina. Martina said the hook was in place on May 14, 2020, because she needed a basket out of the room and she had to ask Dymond to open the door for her. Additionally, the door to room 106 was "heavy" and "you had [to] kind of lift it up a little" to get it open; Martina was not able to lift up the door to move it.

Martina stated that rooms 102 and 104 were clean on May 14, 2020. Room 106 had "papers and stuff around the room . . . but just like any other room would be like" if someone was staying in it. She said that Dymond's siblings stayed in room 106 several times each week. Martina also said that Dymond and Trenton had two dogs, one of which was "just a pup," "not even quite a year old yet." She did not see any animal feces or urine while she was there on May 14.

SUFFICIENCY OF EVIDENCE

As stated earlier in this opinion, to obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). And while the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id.*

In the petition, the State alleged that Ahana was a child within the meaning of § 43-247(3)(a) because she lacked proper parental care by reason of the fault or habits of Dymond and Trenton, and/or that she was in a situation injurious to her health or morals. The State specifically alleged that Ahana was in hotel rooms joined together and rented by Dymond and/or Trenton; there was food waste and dog feces throughout the rooms, with no clean area for Ahana to sleep; marijuana, drug paraphernalia, a methamphetamine pipe with residue that pre-tested positive for amphetamines/methamphetamine, and a firearm were located in the rooms, and all of the items were accessible to Ahana; and the actions of Dymond and Trenton and/or the above situation placed Ahana at risk of harm.

Both Dymond and Trenton point us to *In re Interest of Carrdale H.*, 18 Neb. App. 350, 781 N.W.2d 622 (2010), to support their claim that the risk of harm to Ahana could not be considered

definite. However, we find the facts in *In re Interest of Carrdale H.* to be distinguishable from the present case.

In *In re Interest of Carrdale H., supra*, the juvenile court adjudicated a child based upon the father's possession of crack cocaine on one occasion, and this court reversed the adjudication order. We noted that the State failed to adduce any evidence regarding whether the father was charged with a crime, whether the father had any history of drug use in or out of the child's presence, whether the child was present when the father possessed the drugs, or whether the child was affected in any way by the father's actions. We held that the State failed to prove by a preponderance of the evidence the petition's allegation that the father's use of drugs placed said child at risk for harm.

Unlike in *In re Interest of Carrdale H., supra*, the present case involves more than a one-time possession of drugs that may not have occurred in the child's presence. Investigator Eirich testified that drugs, drug paraphernalia, and a weapon were located in room 106, part of the suite of rooms occupied by Dymond, Trenton, and Ahana. There was some dispute as to whether room 106 would have been accessible to Ahana. However, the juvenile court specifically found that "[t]o the extent that [Martina's] testimony conflicted with that of Inv. Eirich, the court did not find [Martina] to be as credible of a witness." See *In re Interest of Kane L. & Carter L., supra* (when evidence in conflict, appellate court may give weight to fact that lower court observed witnesses and accepted one version of facts over other). Additionally, according to Investigator Eirich's testimony, Trenton admitted that he had gone to Colorado to buy marijuana, both Trenton and Dymond admitted to being involved in the use and sale of controlled substances, and both also admitted to having smoked methamphetamine in their room days prior. Investigator Eirich also testified about how the use and sale of drugs caused potential risks of harm to children.

Based on our de novo review of the record, without even considering the trash and dog feces present in the hotel rooms, we find by a preponderance of the evidence that Ahana is at definite risk of future harm. We also find by a preponderance of the evidence that Ahana was a child within the meaning of § 43-247(3)(a). We therefore affirm the adjudication of Ahana based on counts I and II of the petition.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court adjudicating Ahana.

AFFIRMED.