IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF NOAH J. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF NOAH J. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

HANNAH B., APPELLANT, AND MICHAEL B., APPELLEE AND CROSS-APPELLANT.

Filed January 27, 2015.    No. A-14-453.

Appeal from the Separate Juvenile Court of Lancaster County: LINDA S. PORTER, Judge. Affirmed.

Jonathan Braaten, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Joe Kelly, Lancaster County Attorney, Carolyn C. Bosn, and Lory Ann Pasold for appellee State of Nebraska.

Karin L. Walton for appellee Michael B.

IRWIN, RIEDMANN, and BISHOP, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Hannah B. appeals, and Michael B. cross-appeals, from an order of the juvenile court, which order terminated their parental rights to their minor children. On appeal, Hannah challenges the statutory grounds for termination of her parental rights and the juvenile court's finding that termination of her parental rights is in the children's best interests. On cross-appeal, Michael argues that the juvenile court erred in denying his motion to remove the children from their current foster care placement and place them with relatives. In addition, he, too, challenges the juvenile court's finding that termination of his parental right is in the children's best interests.

Upon our de novo review of the record, we find that the State presented sufficient evidence to warrant termination of Hannah's and Michael's parental rights. As such, we affirm the order of the juvenile court terminating Hannah's and Michael's parental rights to their children. In addition, we conclude that the juvenile court's order denying Michael's motion for a change in placement became moot when Michael's parental rights were terminated.

## II. BACKGROUND

These proceedings involve four children: Noah J., born in August 1999; Brianna W., born in July 2007; and Tyshea B. and Chasity B., twin girls born in September 2010. Hannah is the biological mother of all four children. Michael is the biological father of the twins, Tyshea and Chasity, and the stepfather of Noah and Brianna. The biological fathers of Noah and Brianna are not parties to this appeal, and thus, their participation in the children's lives and in the juvenile court proceedings will not be discussed further.

The event which generated these juvenile court proceedings occurred in March 2011, when Hannah took Tyshea, who was then approximately four months old, to an emergency room because she was sick. While she was at the emergency room, Hannah told medical personnel that they had "better admit [Tyshea] before I throw her out of the . . . window." Hannah also became very upset with Tyshea after Tyshea vomited on Hannah. As a result of Hannah's behavior, the medical personnel at the hospital made a report to the Department of Health and Human Services (the Department). The Department implemented services to assist Hannah in parenting her children, but the children were permitted to remain in Hannah's physical custody.

On April 21, 2011, the State filed a petition with the juvenile court, alleging that each of Hannah's four children was within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) due to the faults or habits of Hannah. Specifically, the petition alleged that on one or more occasions since 2010, Hannah had made inappropriate and threatening comments to or in the presence of her children; that Hannah has mental health issues and admitted that she does not regularly take the medication prescribed for these issues; and that Hannah's actions have placed the children at risk for harm.

At the time the petition was filed, Michael was incarcerated and awaiting trial on two charges of robbery which had allegedly occurred shortly after the twins' birth in September 2010. We will separately discuss Hannah's and Michael's participation in the juvenile court proceedings.

### 1. Hannah

In June 2011, two months after the petition was initially filed, Hannah pled no contest to the allegations in the petition. As a result of Hannah's plea, the children were adjudicated pursuant to § 43-247(3)(a), but were permitted to continue residing with Hannah, as the Department reported to the court that Hannah was cooperative with the services already being provided to her. After a subsequent disposition hearing, the juvenile court formally ordered Hannah to participate in a rehabilitation plan. As a part of this plan, Hannah was required to (1) cooperate with "drop-in" visits from the Department to ensure the children's safety in her home; (2) participate in parenting education sessions; (3) maintain a safe and sanitary living environment for herself and the children; (4) maintain employment or a legal means of financial

support; (5) attend weekly individual therapy to address her mental health needs and take her mental health medication as prescribed; (6) attend all medical, educational, and developmental appointments for the children; and (7) not smoke or use profane language in the presence of any of the children.

In March 2012, a review hearing was held. At this hearing, the family's Department caseworker testified that the children were no longer doing well in Hannah's physical custody. Hannah's cooperation with services had declined and was not improving. She was no longer employed and was not attending therapy on a consistent basis. Hannah admitted to striking Noah so hard that she had given him a bloody nose. In addition, there was evidence that Noah was struggling with his own mental health issues and had recently been admitted to the hospital due to suicidal threats. The Department recommended that the children be removed from Hannah's home and placed in foster care. The juvenile court followed the Department's recommendation and ordered the children removed to an out-of-home placement. The children have remained placed outside of Hannah's home since this order in March 2012.

After the children were removed from Hannah's home, her cooperation with the Department and with the court-ordered rehabilitation plan continued to deteriorate. The Department reported that Hannah was inconsistent in attending visitation with the children, she did not have stable housing, she was not employed, and she was not attending therapy or taking all of her medications. In addition, in approximately April 2013, Hannah was arrested and jailed after it was discovered that she continued to receive and spend Noah's social security disability payments even after he was placed outside of her home. The last time Hannah has visited with any of her children was in April 2013, prior to her arrest.

On July 5, 2013, the State filed a motion to terminate Hannah's parental rights. The State alleged that termination of Hannah's parental rights was warranted pursuant to Neb. Rev. Stat. § 43-292(2) (Cum. Supp. 2012), because she had substantially and continuously or repeatedly neglected and refused to give her children necessary parental care and protection; § 43-292(6), because reasonable efforts to preserve and reunify the family failed to correct the conditions that led to the determination that the children were within the meaning of § 43-247(3)(a); and § 43-292(7), because the children had been in an out-of-home placement for 15 or more months of the most recent 22 months. In addition, the State alleged that termination of Hannah's parental rights was in the best interests of the children.

2. Michael

In November 2011, approximately 7 months after the juvenile court proceedings had been initiated, Michael pled no contest to the two counts of robbery he had previously been charged with. He was then sentenced to a total of 16 to 28 years in prison. Accordingly, Michael remained incarcerated for the duration of the juvenile court proceedings.

In August 2012, Michael filed a motion requesting visitation with Tyshea and Chasity at the prison where he was housed. A hearing was held on the motion where the State presented evidence that the girls had very little interaction with Michael since they were removed from Hannah's home. Michael had telephoned during Hannah's visitation time, but she was no longer able to take them to the prison to see Michael as she had done on various occasions when the children were still in her physical custody. The Department indicated its position that visits

between Michael and the girls at the prison would not be beneficial given the girls' young age. The juvenile court denied Michael's motion for visitation. As a result of the court's decision, Michael has not seen Tyshea and Chasity since at least March 2012.

On July 5, 2013, the State filed a second supplemental petition and a motion for termination of Michael's parental rights to Tyshea and Chasity. The second supplemental petition alleged that the girls were within the meaning of § 43-247(3)(a) as to Michael because they have been in foster care since March 2012 and, since that time, Michael has been unable to put himself in a position to care for their basic needs or to provide a stable living environment for them. The motion for termination of Michael's parental rights alleged that termination was warranted pursuant to § 43-292(2), because he had substantially and continuously or repeatedly neglected and refused to give his children necessary parental care and protection, and pursuant to § 43-292(7), because the children had been in an out-of-home placement for 15 or more months of the most recent 22 months. In addition, the motion alleged that termination of Michael's parental rights was in Tyshea's and Chasity's best interests.

Shortly after the State filed its second supplemental petition and motion for termination of Michael's parental rights, Michael filed a motion requesting that the juvenile court change Tyshea's and Chasity's foster care placement. He requested that the girls be moved to his aunt's home so that they could reside with relatives. The court held a hearing concerning Michael's request for the change in placement, and ultimately denied the request after learning that the Department did not support such a change for the children.

### 3. Termination Hearing

On October 18, 2013, a hearing was held on the State's motion for termination of Hannah's parental rights and on its supplemental second petition and motion for termination of Michael's parental rights. The hearing continued on November 14, 2013, and on March 20, 2014. While we have reviewed the evidence presented at the lengthy hearing in its entirety, we do not set forth the specifics of the testimony and exhibits here. Rather, we will set forth specific facts as presented at the hearing as necessary in our analysis below.

At the conclusion of the termination hearing, the juvenile court entered an order detailing the evidence presented at the termination hearing. After its analysis of all the evidence, the court found that grounds for termination of Hannah's parental rights existed under § 43-292(2), (6), and (7), and that it would be in the children's best interests to terminate Hannah's parental rights. The court also adjudicated Tyshea and Chasity as children within the meaning of § 43-247(3)(a) as to Michael. The court then found that termination of Michael's parental rights was warranted pursuant to § 43-292(2) and (7) and that such termination would be in the girls' best interests. The juvenile court ordered that Hannah's and Michael's parental rights be terminated.

Hannah appeals and Michael cross-appeals from the juvenile court's order.

### III. ASSIGNMENTS OF ERROR

On appeal, Hannah alleges that the juvenile court erred in finding that the State proved the statutory factors for termination of her parental rights and in finding that termination of her parental rights was in the children's best interests. In addition, she alleges that the State failed to

demonstrate that there was a risk of future harm to the children if they were left in her care and custody.

On cross-appeal, Michael alleges that the juvenile court erred in finding that termination of his parental rights was in the children's best interests. In addition, he alleges that the court erred in denying his motion to change the placement of Tyshea and Chasity.

## IV. ANALYSIS

### 1. Standard of Review

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Jagger L.*, 270, Neb. 828, 708 N.W.2d 802 (2006). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that termination is in the child's best interests. See *In re Interest of Jagger L.*, *supra*. The State must prove these facts by clear and convincing evidence. *Id.* Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proven. *Id.*

### 1. Hannah's Appeal

In her appeal, Hannah challenges both the statutory basis for termination of her parental rights and the juvenile court's finding that termination of her parental rights is in Noah's, Brianna's, Tyshea's and Chasity's best interests. We first address Hannah's assertions concerning the statutory basis for termination.

### (a) Statutory Basis for Termination

In her brief to this court, Hannah makes various assertions concerning the juvenile court's findings that termination of her parental rights was warranted pursuant to § 43-292(2) and (6). However, Hannah does not make any assertions concerning the juvenile court's finding that termination was also warranted pursuant to § 43-292(7). Because we find that the evidence clearly and convincingly demonstrates that all four of Hannah's children were in an out-of-home placement for at least 15 of the most recent 22 months, pursuant to § 43-292(7), we need not specifically address whether the State also met its burden under § 43-292(2) or (6).

As we stated above, termination of parental rights is warranted whenever one or more of the statutory grounds provided in § 43-292 is established. If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Jagger L.*, *supra*.

Section 43-292(7) provides for termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). This section

operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of the parent. *In re Interest of Aaron D.*, *supra*.

In this case, the State alleged, and the court found, that termination of Hannah's parental rights was warranted pursuant to § 43-292(2), (6), and (7). At the hearing, there was uncontradicted evidence which demonstrated that approximately 15 months passed from the time that the children were removed from Hannah's home in March 2012 and the time that the State filed its motion to terminate Hannah's parental rights in July 2013. An additional 9 months passed from the time the motion was filed to the time the termination hearing concluded in March 2014. In sum, the children had been in an out-of-home placement for 24 months at the time the termination hearing concluded. As such, there is no dispute that the children were in an out-of-home placement for 15 or more months of the most recent 22 months as § 43-292(7) requires.

There is clear and convincing evidence that termination of Hannah's parental rights was appropriate pursuant to § 43-292(7). In light of this fact, we need not, and do not, further address the sufficiency of the evidence to demonstrate that termination was also appropriate pursuant to § 43-292(2) or (6). Hannah's assignments of error relating to the sufficiency of the statutory authority to support termination are without merit.

(b) Best Interests of the Children

In the previous section, we found that termination of Hannah's parental rights was appropriate pursuant to § 43-292(7). As a result, we declined to address the sufficiency of the evidence demonstrating that termination was also appropriate pursuant to § 43-292(2) or (6). We, therefore, treat our discussion of whether terminating Hannah's parental rights is in the children's best interests as though § 43-292(7) is the only statutory basis for termination.

In cases where termination of parental rights is based solely on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is, in fact, in the child's best interests. *In re Interest of Aaron D.*, *supra*. In such a situation, because the statutory ground for termination does not require proof of such matters as abandonment, neglect, unfitness, or abuse, as the other statutory grounds do, proof that termination of parental rights is in the best interests of the child will require clear and convincing evidence of circumstances as compelling and pertinent to a child's best interests as those enumerated in the other subsections of § 43-292. *In re Interest of Aaron D.*, *supra*.

In her appeal, Hannah argues that termination of her parental rights is not in the children's best interests because she simply needs more time and assistance to become an appropriate and effective parent to her four children. She also asserts that there was insufficient evidence presented to demonstrate that she is presently an unfit parent or that she does not have the ability to become a fit parent in the future. In support of this argument, Hannah directs our attention to evidence in the record which demonstrates that for the first part of the juvenile court proceedings, she cooperated with the Department and with the services offered to her and that she made some progress in her parenting abilities.

Hannah's assertions have no merit. Although we acknowledge that there was a brief period of time at the beginning of the juvenile court proceedings when Hannah was cooperative and appeared to be making some progress in her parenting abilities, the majority of the evidence presented at the termination hearing revealed that any such cooperation existed only in the short term. It is clear that the Department and the juvenile court offered Hannah a variety of resources to assist her in reuniting her family and that she was provided with ample time to achieve such reunification, but she simply failed to avail herself of the opportunities provided to her. Instead, Hannah consistently and continuously failed to cooperate with the juvenile court and with the Department. In addition, there was abundant evidence which demonstrated that Hannah is an unfit parent.

The juvenile court proceedings involving Hannah and her children were initiated in April 2011. At this time, the children were permitted to remain in Hannah's physical custody because she acknowledged that she was struggling as a single parent and that she was suffering from mental health issues. Perhaps more importantly, Hannah was accepting of and cooperative with the services provided to her by the Department. During the early stages of the proceedings, Hannah obtained appropriate and stable housing for herself and her children. She found employment and daycare for the youngest children. She participated in individual therapy and began taking her medications. She also involved Noah, who suffered from serious behavioral problems, in individual and family therapy. However, as the case progressed, Hannah's cooperation and stability started to diminish.

At a review hearing held in March 2012, the Department reported that Hannah was no longer cooperating with the intensive in-home services which were designed to permit the children to remain in her care. Hannah no longer permitted service providers to come into her home for all of the family's scheduled sessions. In addition, both Hannah's and Noah's participation in therapy dwindled, which seemed to have a serious impact on Noah's mental health. He repeatedly threatened suicide or harm to others and was hospitalized on more than one occasion. In addition, Hannah could not control Noah's behavior and admitted to resorting to physical violence when she was angry with him. Prior to the March 2012 hearing, Noah had suffered from a bloody nose after Hannah struck him in the face. Hannah also did not readily cooperate with school personnel in their efforts to address Noah's behavior problems. Evidence at the termination hearing revealed that Hannah engaged in other inappropriate disciplinary tactics as well. She often yelled at the children and used inappropriate language when she was upset. After the March 2012 hearing, the children were removed from Hannah's physical custody.

Hannah's participation and cooperation with the services provided to her only worsened after the children were removed from her home. In addition, she failed to maintain any sort of stability in her life. By October 2012, Hannah did not have a stable residence. Instead, she moved from place to place, staying with friends. For the duration of the juvenile court proceedings, she did not regain independent housing. Hannah was unable to secure and maintain employment. Her employment record was sporadic and, when she did find a job, she did not remain there for very long. The majority of Hannah's income consisted of Noah's social security disability checks. However, she was no longer supposed to be receiving and accepting this money, because Noah no longer resided with her. Hannah's deceptive actions in this regard

resulted in her being arrested and charged with theft by deception, a Class III felony, for which she faces up to 20 years in prison. At the time of termination hearing, Hannah's criminal charge had not yet been resolved.

Despite Hannah's initial admissions that she suffered from serious mental health issues and needed therapy and medication, she failed to consistently participate in individual therapy and failed to take her medication on a regular basis. Often, Hannah would report that she could not afford her medication because she was unemployed and did not have insurance. The Department attempted to assist Hannah with obtaining the medication, but Hannah never cooperated with such efforts. Hannah did participate in a psychological evaluation in 2012. The results of the evaluation revealed that Hannah suffered from bipolar disorder and that she had borderline intellectual functioning. The report indicated that, partially as a result of these conditions, Hannah does not have an adequate knowledge base and skill set for parenting and she does not have effective strategies for disciplining her children. Ultimately, the report concluded

> [Hannah] presents as having inadequate capacity to consistently, adequately and safely function in a parental role at this point. The presenting information does not support [Hannah] attempting to independently parent as this would be expected to increase the risk for physical child abuse and child neglect creating dangerous situations for her children.

The report offered numerous recommendations to improve Hannah's mental health circumstances and her parenting abilities, including, completion of a parenting class; participation with family support services; participation with individual therapy and medication management; and completion of an anger management program. Hannah did not actively cooperate or participate in any of these recommendations. In addition, she did not make any documented progress towards improving her mental health or her parenting abilities. Accordingly, by the time of the termination hearing, she remained incapable of independently parenting her children.

After the children were removed from Hannah's home, she was permitted supervised visitation time with them. The visits were supervised by a family support worker who offered parenting suggestions and assistance to Hannah throughout the visits. However, Hannah failed to consistently apply any of the lessons taught to her by the family support worker. She did not respond to any parenting advice or redirection. In fact, the worker reported that Hannah made no real improvement in her parenting abilities. This fact is exemplified by Hannah's failure to ever advance passed completely supervised visitation time.

Beginning in August 2012, Hannah became less consistent in even attending visitations with the children. Between August 2012 and February 2013, there were 44 scheduled visitations between Hannah and the children. Hannah attended only 24 of those sessions. When she did attend, she often terminated the visits early. In April 2013, Hannah was arrested and jailed for accepting Noah's social security checks. She has not visited with the children since her arrest. However, none of the children have asked to see her and all of the children's behavior has improved since they no longer see Hannah. The children are thriving in the stability and consistency provided by their foster homes.

At the termination hearing, the Department case workers who had been involved with the family testified that it is in the children's best interests for Hannah's parental rights to be terminated. It was their opinion that the children need permanency and stability and that Hannah has not and will not be able to provide such things to them any time in the near future. Given the evidence presented at the termination hearing, we agree with the opinions of the case workers. Despite the Department's and the juvenile court's efforts for a two year period, Hannah failed to make any genuine, long-term, progress towards becoming an effective and appropriate parent to her children. Hannah is currently no closer to being able to provide for her children's needs than she was when these proceedings were initiated. In fact, there is certainly evidence to suggest that Hannah is currently in a worse position than she was when the case began. Hannah's psychological assessment revealed that she is not fit to parent her children until she is ready to address her mental health needs and to improve her parenting abilities. Hannah has declined to work towards either goal. As such, she remains unfit to parent her four children. We conclude that the termination of Hannah's parental rights is in the best interests of Noah, Brianna, Tyshea, and Chasity. We, thus, affirm the order of the juvenile court.

### (c) Risk of Future Harm

Finally, Hannah asserts that the State did not prove by clear and convincing evidence that failure to terminate her parental rights would subject her children to future harm. In support of her assertion, Hannah cites to language contained in *In re Interest of Carrdale H. II*, 18 Neb. App. 350, 352, 781 N.W.2d 622, 624 (2010). In that case, this court stated, "Generally, the State need not prove that the juvenile has actually suffered harm but must establish that without intervention, there is a definite risk of future harm." Hannah argues that because there was not a sufficient showing of a definite risk of future harm if her children were permitted to remain in her care and custody, that her parental rights must remain intact. We disagree.

Hannah's reliance on *In re Interest of Carrdale H. II*, *supra*, is mistaken, because that case addresses the necessary requirements to adjudicate a juvenile under § 43-247(3)(a) and does not address the requirements for termination of parental rights pursuant to § 43-292. During the initial stages of the juvenile court proceedings, Hannah pled no contest to the allegation that her children were within the meaning of § 43-247(3)(a). She also did not appeal from the court's adjudication order, which was based on her plea. Since the definite risk of future harm requirement applies to adjudicating a child under § 43-247(3)(a) and does not apply to § 43-292 or the best interests analysis, this assigned error is without merit.

### (d) Conclusion

Upon our de novo review of the record, we find that the State presented sufficient evidence to warrant termination of Hannah's parental rights pursuant to § 43-292(7). In addition, we find that there was clear and convincing evidence that termination is in Noah's, Brianna's, Tyshea's and Chasity's best interests. We, thus, affirm the order of the juvenile court terminating Hannah's parental rights to her children.

### 3. Michael's Cross-Appeal

In his cross-appeal, Michael challenges the juvenile court's finding that termination of his parental rights is in Tyshea's and Chasity's best interests. In addition, he asserts that the juvenile court erred in denying his motion to change the foster care placement for the girls. We first address Michael's assertion concerning the termination of his parental rights.

### (a) Best Interests of the Children

On appeal, Michael challenges the juvenile court's finding that termination of his parental rights is in Tyshea's and Chasity's best interests. He does not, however, challenge the court's findings with regard to the statutory basis for the termination of his parental rights. As such, he does not challenge the juvenile court's finding that he had substantially and continuously or repeatedly neglected the children and refused to give the children necessary parental care and protection, pursuant to § 43-292(2), or that the children have been in an out-of-home placement for 15 or more months of the most recent 22 months, pursuant to § 43-292(7). Michael only asserts that the juvenile court erred in finding that termination was in the girls' best interests because the court focused exclusively on his incarceration and did not consider evidence that Michael is a loving father who has a bond with the girls and who has been working to rehabilitate himself while in prison.

Upon our de novo review of the record, we find that Michael's assertions have no merit. The evidence presented at the termination hearing revealed that Michael has a lengthy criminal history and has been in and out of prison for the past ten years. His most recent incarceration began shortly after the twins' birth. As a result, he does not have a strong bond or a relationship with Tyshea or Chasity. Moreover, as a result of this incarceration, he will be unable to function as a parent to the girls for the foreseeable future.

The Nebraska Supreme Court has recognized that in termination of parental rights cases, it is proper to consider a parent's inability to perform his or her parental obligations because of imprisonment. *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999). A parent's inability to perform his parental obligations because of imprisonment, the nature of the crime committed, as well as the person against whom the criminal act was perpetrated are all relevant to the issue of parental fitness and child welfare, as are the parent's conduct prior to imprisonment and during the period of incarceration. *In re Interest of Ditter*, 212 Neb. 279, 322 N.W.2d 642 (1982). However, imprisonment, alone does not necessarily justify an order for termination of parental rights. See *Id.*

In this case, the undisputed evidence presented at the termination hearing revealed that Michael was arrested and charged with two counts of robbery in October 2010, less than one month after Tyshea and Chasity were born. Ultimately, Michael pled no contest to both charges and, in December 2011, he was sentenced to an aggregate sentence of 16 to 28 years in prison. Accordingly, Michael will not be available to parent the girls for a large part of their childhood. And, this is not the first time that Michael has been incarcerated for a lengthy period of time.

In 2002, Michael was arrested and charged with operating a motor vehicle to avoid arrest. In 2003, he was arrested and charged with robbery and use of a deadly weapon to commit a felony. As a result of these three charges, Michael served approximately six and one-half years in prison. In fact, Michael was released in November 2009, less than one year before committing

his most recent offenses. This evidence suggests that Michael struggles to sustain a crime-free, stable lifestyle outside of the walls of a prison. As such, even after Michael is released from prison, he will have to demonstrate his ability to sustain a law-abiding lifestyle before he can be reunited with his children.

There was evidence that Michael has spent time trying to improve himself while in prison. He obtained his high school diploma and completed two separate parenting classes. While we applaud Michael's efforts, we conclude that these efforts do not constitute substantial progress towards reunification with the children, as Michael would suggest. This is especially true in light of Michael's criminal history and in light of the timing of his most recent incarceration, so close in time to the birth of his children.

In addition, contrary to Michael's suggestions, he does not have a strong bond or a loving relationship with Tyshea and Chasity. In fact, the girls have virtually no relationship with Michael whatsoever. As we stated above, Michael was arrested and jailed shortly after their birth and has only seen the girls a handful of times since then. Hannah did take the girls to visit Michael in prison during the time she retained custody. However, after March 2012, when Hannah lost custody, Michael has only been able to communicate with the girls over the telephone during Hannah's visitation time. Because Hannah's visitation time with the girls became sporadic and eventually ended altogether, so did Michael's brief telephonic contact. There was some evidence that Michael did send the girls letters and cards, but such efforts did not occur on a regular basis.

In the juvenile court's order, it summarized the evidence presented at the termination hearing as follows:

> Significantly, [Michael] committed at least two serious felony offenses involving violence within days of his daughters' birth. . . . [Michael] had also only been out in the community for approximately a year at the time he committed his most recent offenses, after serving six years in prison for previous offenses, including a previous Robbery and Use of a Deadly Weapon to Commit a Felony. He was clearly aware of the potential consequences of committing another violent felony when he took the actions he did on September 29 and October 7, 2010. By his own voluntary actions, [Michael] has made himself unavailable as a parent to Chasity and Tyshea for the next several years, and potentially longer. Given his history over the last decade, his commitment to living a non-violent, law-abiding life outside a correctional setting would also bear testing out over a significant period of time before a child could safely be placed in his care.

The court went on to find:

> [Michael]'s reported efforts while incarcerated to become a better parent and person generally are not to be discouraged . . . . In the case of [Chasity] and Tyshea, however, they are now three years old, and have lived half of their lives in foster care. Nothing in the case law or statutory authority warrants the lengthy wait these children would be forced to endure to see if [Michael]'s approach to parental responsibility the next time he is released would be different. For these reasons, the Court finds that [Michael] is not fit at this time or in the foreseeable future to parent Chasity or Tyshea . . . and that it is in their best interests that his parental rights be terminated.

Based upon our review of the record, we agree with the court's findings and conclude that there is sufficient evidence to demonstrate that termination of Michael's parental rights is in the best interests of Tyshea and Chasity. By the time of the termination hearing, the girls had been in an out-of-home placement for approximately 2 years. The girls deserve a permanent and stable home environment, which Michael has repeatedly demonstrated that he is unable to provide. We affirm the order of the juvenile court.

(b) Motion for Change in Placement

Michael argues that the juvenile court erred in denying his motion to change his daughters' foster care placement to one of his relative's homes. Specifically, he asserts that the relative was willing to provide care to the girls and that the home was suitable and appropriate. Essentially, he asserts that there was no reason for the court to deny the motion. Upon our review, we conclude that once Michael's parental rights to Tyshea and Chasity were terminated, his request that the girls be placed with his relatives became moot. Accordingly, because we affirm the decision of the juvenile court to terminate Michael's parental rights, we do not consider his assertions regarding his placement request.

A case becomes moot when the issues initially presented in litigation cease to exist or the litigants lack a legally cognizable interest in the litigation's outcome. *In re Interest of Thomas M.*, 282 Neb. 316, 803 N.W.2d 46 (2011). Although mootness does not prevent appellate jurisdiction, it is a justiciability doctrine that can prevent courts from exercising jurisdiction. *Id.*

In this case, Michael filed a motion requesting placement of his daughters with relatives prior to the time the juvenile court terminated his parental rights. The court denied this motion, finding that such a change in the girls' placement was not in their best interests. Subsequent to this finding, the juvenile court entered an order terminating Michael's parental rights. We have affirmed that order on appeal.

Neb. Rev. Stat. § 43-293 (Reissue 2008), specifically provides, "An order terminating the parent-juvenile relationship shall divest the parent and juvenile of all legal rights, privileges, duties, and obligations with respect to each other . . . ." As such, once Michael's parental rights were terminated, he no longer possessed the privilege or the authority to be involved in the decision about the best, or most appropriate, placement for his children. Moreover, we note that once Michael's parental rights were terminated, his claim that his relatives should be given some sort of preference for the girls' placement ceased to lack any merit, as Michael's relatives also no longer possess any familial relationship with the girls. See *In re Interest of Ditter*, 212 Neb. 855, 326 N.W.2d 675 (1982) (when parental rights of surviving parent have been terminated, that parent's parents lack standing to request visitation rights).

We conclude that Michael's assertions concerning the placement of his children have become moot, because after his parental rights were terminated, Michael no longer had a legally cognizable interest in the proper placement for his children. In coming to this conclusion, we acknowledge that, prior to the termination of his parental rights, Michael attempted to appeal from the juvenile court's denial of his motion for relative placement. However, we dismissed the appeal after finding that the court's order was not final and that we lacked jurisdiction. See *In re Interest of Brianna W.*, case No. A-13-1019. We note that there are a large variety of non-final orders which may become moot when the ultimate issues in a case are resolved and, which thus,

may evade our review. However, the potential that an order may become moot if not reviewed during an interlocutory appeal does not grant an appellate court with jurisdiction. In fact, one reason an appellate court declines to address non-final orders is that often the issues involved in the non-final order will be mooted by the outcome of the ultimate issues of the case. See, e.g., *Cerny v. Todco Barricade Co.*, 273 Neb. 800, 733 N.W.2d 877 (2007).

### (c) Conclusion

Upon our de novo review of the record, we find that there was clear and convincing evidence that termination of Michael's parental rights is in Tyshea's and Chasity's best interests. We, thus, affirm the order of the juvenile court terminating Michael's parental rights to his children. In addition, we decline to address the propriety of the juvenile court's order denying Michael's motion to place the children in the home of relatives, as such issue became moot when Michael's parental rights were terminated.

### V. CONCLUSION

Upon our de novo review of the record, we find that the State presented sufficient evidence to warrant termination of Hannah's and Michael's parental rights. As such, we affirm the order of the juvenile court terminating their parental rights to their minor children. In addition, we conclude that the juvenile court's order denying Michael's motion for a change in placement became moot when Michael's parental rights were terminated.

AFFIRMED.